UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CITY WALK - URBAN MISSION INC., RENEE MILLER, and ANTHONY MILLER,

Plaintiffs,

vs.

CITY OF TALLAHASSEE,

Defendant.

CASE NO.:

**COMPLAINT FOR DECLARATORY JUDGMENT, PERMANENT INJUNCTION AND DAMAGES**

Plaintiffs bring this suit pursuant to 42 U.S.C. §1983, seeking declaratory, injunctive and other relief against §§2-138, 9-155, and 10-417 of the Tallahassee Land Development Code, and Article IX of the Bylaws of the Tallahassee-Leon County Planning Commission, together with certain policies and practices of the City of Tallahassee. Plaintiffs seek a declaratory judgment declaring such ordinances, policies and practices to be unconstitutional under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs further seek issuance of an injunction against those unconstitutional ordinances, practices and policies. Plaintiffs also demand damages against the Defendant for losses occasioned by the unconstitutional application of the City's laws and policies against the Plaintiffs.

**JURISDICTION**

1. This suit is brought pursuant to 42 U.S.C. §1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

> be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

2. This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution, and under 28 U.S.C. §1343(4) to secure equitable or other relief for the protection of civil rights.

3. The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

4. The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

5. This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiffs' rights, privileges and immunities under the Constitution of the United States and Title 42 U.S.C. §§1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

6. This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain ordinances policies and practices of the Defendant. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning the Defendant' actions taken under color and authority of "state" law and procedures, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

**VENUE**

7. Venue is proper in the Northern District of Florida, Tallahassee Division, since the laws and policies complained of are those of Tallahassee, Florida, which is within the district and geographical area assigned to the Tallahassee Division.

**PARTIES**

8. Plaintiff, CITY WALK - URBAN MISSION INC. (hereinafter referred to as "CITY WALK") is a Florida not-for-profit corporation which operates a church and religious mission catering to the homeless population located at 1709 Mahan Drive, Tallahassee, Leon County, Florida. The subject property is located within the municipal boundaries of the City of Tallahassee. Plaintiff is the entity beneficially interested in the relief herein sought and seeks to invoke the original jurisdiction of this Court on account of the facts and matters herein stated.

9. Plaintiff, RENEE MILLER, (hereinafter referred to as "RENEE") is an individual, *sui juris*, residing in Tallahassee, Florida. RENEE is the President and pastor of City Walk. In addition to her duties as principal of City Walk, RENEE expresses her individual religious beliefs through the City Walk mission. Plaintiff is beneficially interested in the relief herein sought and seeks to invoke the original jurisdiction of this Court on account of the facts and matters herein stated.

10. Plaintiff, ANTHONY MILLER (hereinafter referred to as "ANTHONY"), is an individual, *sui juris*, residing in Tallahassee, Florida. ANTHONY is the Vice-President and a lay pastor of City Walk. In addition to his duties as principal of City Walk, ANTHONY expresses her individual religious beliefs through the City Walk mission. Plaintiff is beneficially interested in the relief herein sought and seeks to invoke the original jurisdiction of this Court on account of the facts and matters herein stated.

11. Defendant, CITY OF TALLAHASSEE, Florida ("CITY" or "TALLAHASSEE"), is a Florida municipal corporation, organized and operating under the laws of the State of Florida.

12. The Tallahassee-Leon County Planning Commission ("Planning Commission"), is a government agency or body created by the CITY OF TALLAHASSEE. *See*, §2-111, LDC. This Court has described that subordinate agency in the following terms:

> The Tallahassee–Leon County Planning Commission ["Planning Commission" or "Commission"] is an administrative agency of the city authorized to act in an advisory capacity to the City Commission.

<u>Everett v. City of Tallahassee</u>, 840 F.Supp. 1528, 1531 (N.D. Fla. 1992).

## <u>COLOR OF STATE LAW</u>

13. As a political subdivision of the State of Florida, organized and operating under the laws of the State of Florida, TALLAHASSEE and the Planning Commission and their agents, were, and are, acting under color of state law and authority.

## <u>PLAINTIFFS' RELIGIOUS BELIEFS AND PRACTICES</u>

14. CITY WALK operates a church and religious mission catering to the most downtrodden and needy of our fellow citizens – the homeless.

15. RENEE has described this mission in the following terms:

> [O]ur mission is to connect people to God and to each other, to change lives forever. We do this by an Acts 2 church model, and we take very seriously the 73 times that we are commanded in scripture to take care of the poor and needy and to take up the cause of justice for those who are also poor and needy.… [T]he majority of the parishioners at our congregation and church members are in some form of crisis or experiencing homelessness in one form or another.
>
> [W]e are a church, and our focus is that we believe God has called us to … the people who are in crisis, specifically as it pertains to housing and food and clothing, taking care of people who are marginalized and looked over in society. So a large part of our worship with our church is bringing the stranger in as Jesus commands us to do in Matthew 25.

16. CITY WALK provides food, shelter, and counseling for its residents.

17. CITY WALK administers to its residents' religious needs through Bible studies and Christian church services. However, CITY WALK does not impose a religious test on its residents, and it welcomes all of God's children.

18. The religious component of CITY WALK's mission sets it apart from secular providers of housing for the homeless. As RENEE has previously testified:

> [H]ow we differ based on the service, delivery of services, would be that we have a more holistic approach. We are not just concerned with getting somebody three hot meals and a cot so that they, you know, don't die from exposure or something, but we really want to work on the whole person and their soul and the spirit at the same time.

19. The CITY WALK mission is located at 1709 Mahan Drive, a four lane divided highway also designated as U.S. Highway 90.

20. The CITY WALK property is located in the OR-2 zoning district.

21. Plaintiffs selected the property after first scouring the community for an appropriate site. It chose this particular site because it was an appropriate size and it was conveniently located near public transportation - a requirement under the City's Code.

22. The CITY WALK building provides residential accommodations for up to 64 residents.

23. The CITY WALK facility is designed to provide supportive housing, which includes social services in a rules-based environment.

24. CITY WALK counseling services include both religious and secular counseling. The secular counseling is provided by mental health professionals who provide services ranging from anger management to vocational counseling to treatment for addiction and alcoholism.

25. CITY WALK's homeless mission is considered to be a "Transitional Residential Facility" pursuant to §1-2- Definitions, Tallahassee LDC,

26. Plaintiffs consider the operation of the Transitional Residential Facility to be a religious practice and an integral part of their religious mission.

**PLAINTIFFS' RELIGIOUS MISSION IS A FORM OF FREE SPEECH PROTECTED BY THE FIRST AMENDMENT**

27. Plaintiffs both practice and express their religious beliefs through operation of the City Walk homeless mission.

28. The Free Exercise component of Plaintiffs' claim is self-evident.

29. Plaintiffs' religious beliefs and religious practices have a free speech component which is distinguishable from and yet intimately tied to their religious faith.

30. Plaintiffs communicate a specific message which is understood by their audience. That specific communication is Jesus' message of salvation coupled with a reminder that we must be charitable to our neighbors while on Earth.

31. The religious mission at City Walk is how Plaintiffs express and embody their religious beliefs and religious speech; it is both the medium *and* the message.

32. Plaintiffs' speech finds its expression in three complimentary forms:

A. Plaintiffs operate both a church and lay ministry which preaches primarily to the homeless about the Christian faith and the message of Jesus Christ. This component of their religious message and activities most resembles a conventional church:

(1) While Plaintiffs' church is nondenominational and open to all who seek it out, it is a Christian church with an expressly Christian message of faith and redemption through Christ.

(2) Plaintiffs hold regularly scheduled church services led by RENEE, an ordained Christian minister. Those services are open to all, but cater primarily to City Walk's homeless residents;

(3) Plaintiffs offer religious counseling both formal and informal. The informal efforts are led primarily by ANTHONY, a lay disciple of Christ, who counsels through words and the discipline of good works.

(4) Plaintiffs actively proselytize to lapsed Christians, non-believers and those who follow other faiths so that they come to know the message of Jesus Christ. Plaintiff's believe that the transformation of homeless individuals into productive citizens is best accomplished by reminding them of the hope and promise of the Christian faith.

B. The very act of running a Christian mission for the homeless is an essential expression of Plaintiffs' religious faith. Plaintiffs believe that Jesus Christ has called them to minister to the "least fortunate among us" – a clarion call to provide for the spiritual and physical needs of the unhoused. This expression has the following attributes:

(1) The operation of a homeless mission is intended as a living expression of two aspects of Christ's own mission:

(a) To spread good works and charity among men while the Earth exists; and

(b) To remind their neighbors that Christ promises a better existence in the afterlife.

(2) This example of humility in daily life (expressed through the tough work of caring for the less fortunate) reminds the public of the rich spiritual rewards which come from such work - not the least of which is eternal salvation through Christ.

(3) Plaintiffs' message of faith and redemption is best communicated through the actual *doing* in front of others: spreading Christ's message; the performance of good acts; the example of charity in the community and the improvement in the spiritual and physical condition of individual human beings. As St. Francis of Assisi might have said: "Preach the Gospel at all times. Use words if necessary".

(4) The operation of a Christian mission for the homeless - including the provision of food and shelter - is utterly incapable of being severed from Plaintiffs' religious faith; it is the very means by which Plaintiffs' express their faith. In this regard, Plaintiffs' practices are like that of many other sects and faiths. By way of example, Plaintiffs note the following:

(a) Jehovah's Witnesses are especially noted for their door-to-door proselyting, which they maintain is rooted in Biblical commands.[1]

(b) Youthful members of the Church of Jesus Christ of Latter-Day Saints ("Mormons") youth are encouraged to devote 18-24 months of their lives to missionary work in the field.[2]

---

[1] *See*, JW.ORG/ Official Website of Jehovah's Witnesses:

> We try to contact people at their homes. Jesus trained his disciples to preach the good news from house to house. (Matthew 10:11-13; Acts 5:42; 20:20) … Similarly today, our preaching work is well-organized, and each congregation is given an assigned area to cover. This enables us to fulfill Jesus' command to "preach to the people and to give a thorough witness."—Acts 10:42.

https://www.jw.org/en/library/books/jehovahs-will/jehovahs-witnesses-preaching-work/ (last accessed 2/2/22).

[2] *See*, Churchofjesuschrist.org/:

> Most missionaries are between 18 and 25 years of age. … [T]heir missions last from 18 months to two years…

(c) Hare Krishnas are distinguished by their missions providing free vegetarian food – frequently on college campuses[3] – and the practice of "sankirtan" (seeking alms in public places).[4]

C. The operation of the homeless mission serves as a physical symbol of Christ's message of good will on Earth. That symbol is as expressive and evocative as any words Plaintiffs may speak. Plaintiffs note the following aspects of this symbolic speech:

(1) Unlike Bible readings or religious advocacy, the operation of a Christian mission for the homeless must occur at a particular place; the mission is ultimately rooted in geography as it is the embodiment of God's Word on the physical Earth.

---

> Going around talking about God isn't new. It's what Jesus Christ did when He was alive. After His death and Resurrection, it's what He instructed His disciples to do. That goes for our day too. So while the names of the missionaries vary on those black name tags, the most important name - Jesus Christ - is always there, included in the name of our Church. It is, and always has been, His message the missionaries share.

https://www.churchofjesuschrist.org/comeuntochrist/belong/share-goodness/10-things-to-know-about-missionaries (last accessed 2/1/22).

[3] *See, e.g.*, https://www.facebook.com/KrishnaLunchFSU/ and, for Gator fans, https://krishnalunch.com/about/ ("KRISHNA LUNCH VALUES: Service - Provide UF students and the Gainesville community with wholesome service opportunities to complement their spiritual growth.") (last accessed 2/1/22).

[4] *See, e.g.*, United States v. Silberman, 464 F.Supp. 866, 870 (M.D. Fla. 1979).

> A basic tenet of ISKCON is an obligatory, evangelical religious ritual known as 'sankirtan'. Followers, or devotees, are required to approach people in public places, distributing religious literature and small tokens or gifts, disseminating information, and soliciting donations. Sankirtan has three purposes: (1) to spread the religious information which the Hare Krishna religion deems to be the truth; (2) to proselytize and attract new members; and (3) to generate funds to support the religious activities of the movement. Sankirtan activity propels ISKCON's followers into city streets, tourist areas, airports, state fairs, rest stops along expressways, and urban convention centers.

(2) The spiritual redemption of individual homeless persons and their transformation, through faith, into productive members of society is a living example of the power of Christ's message.

(3) For Plaintiffs' message to be understood this symbol must be viewed; it must have some physical embodiment within the City of Tallahassee. Here, Plaintiffs' audience includes their congregation as well as the broader Tallahassee community; their message is clearly perceived and understood to be the Gospel of Jesus Christ.

**OVERVIEW OF APPLICABLE ORDINANCES AND PROCEDURES**

33. Homeless missions providing residential facilities are defined by §1-2 of the Tallahassee LDC:

> Transitional residential facilities. The term "transitional residential facilities" means facilities or structures, operated, or maintained by a public or not-for-profit corporation or association, religious institution, or government-funded organization to provide shelter for homeless individuals and families on a temporary or transitional basis, with the duration of stay limited to a period not exceeding one year. Normal and customary use of a dwelling unit by a single-family is specifically excluded from the requirements of chapter 10. Transitional residential facilities may also provide services to residents accessory to the provision of shelter, including but not limited to, dining facilities and meal preparation, and referral, counseling and educational programs.

34. A transitional residential facility can be wholly secular with no religious component at all. However, religious persons and institutions wishing to provide residential services for the homeless cannot avoid being classified as a transitional residential facility.

35. Transitional Residential Facilities are regulated by §10-417 of the Tallahassee Land Development Code. A copy of §10-417 is attached as Exhibit "1" to this Complaint.

36. Pursuant to §10-417(b), a Transitional Residential Facility may be located in any zoning district in the City with the exception of the industrial zone:

Sec. 10-417. Transition residential facilities.

> …
> (b) *Where allowed.* Transitional residential facilities may be allowed in any zoning district, with the exception of the industrial district, subject to the limitations and in accordance with the procedures and minimum criteria set forth in this section.

37. However, there is no location within the City of Tallahassee where a transitional residential facility can open as a matter of right.

38. Section 10-417 establishes a form of discretionary or conditional zoning akin to a special exception or a conditional use permit.

39. Pursuant to §10-417(c), LDC, any person or entity wishing to open and operate a transitional residential facility must first seek permission from the City in the form of "Type B Site Plan" approval:

> **Sec. 10-417. Transition residential facilities.**
> …
> (c) *Approval procedure.* New transitional residential facilities and expansions to existing transitional residential facilities are subject to type B site plan approval.

40. Pursuant to §10-417(d), LDC, an application for Type B Site Plan approval must include the following general and specific information:

> (d) *General information required.* Any applicant requesting transitional residential facility approval must submit the following general information for review in order for the application to be considered complete:
>
> (1) Statement describing the purpose of the facility;
>
> (2) Statement justifying the need for the facility;
>
> (3) Statement supporting the proposed location as appropriate for the facility;
>
> (4) Statement of ownership and management of the proposed transitional residential facility;
>
> (5) Legal description and boundary survey signed and sealed by surveyor;

(6) Statement of traffic impact;

(7) General location map showing the relation of the proposed site to existing and proposed features and land uses: major streets, existing utilities and public features, and the land uses of the surrounding area;

(8) Statement of the size and capacity of the proposed transitional residential facility;

(9) Statement describing in detail, the character and intended use of the transitional residential facility; and

(10) The following additional information shall be included for transient residential facility sites which will require new construction:

a. Statement describing the type and availability of utilities and public facilities to be used; and

b. Tabulation of the gross acreage of the site and the area to be devoted to impervious surfaces such as structures and parking lots.

(e) *Specific information required.* Any applicant requesting a transitional residential facility approval must submit the following specific information for review in order for the application to be complete.

(1) A security plan addressing the needs of the facility's residents as well as those of the surrounding community, including a statement describing the special supervision to be provided to residents;

(2) A description of all activities and uses to be conducted on the site;

(3) A description of any needs which may be required by residents of the transitional residential facility which will not be available on site, and a statement indicating how these needs will be met offsite;

(4) A plan indicating:

a. The size, location, height, and setbacks of all existing and proposed buildings and other structures, including a description of the specific use of all buildings and structures;

b. Any natural conditions which may affect the use of the site;

c. Off-street parking;

d. Driveway and access limitation controls;

e. Location and size of open spaces and landscaped areas or buffering elements;

f. The general architectural themes, appearance, and representative building types; and

g. A schedule of any and all renovations or other activities proposed to improve the appearance of any existing structures and grounds.

41. Section 10-417 also lists the criteria which TALLAHASSEE is supposed to apply in evaluating an application for Type B Site Plan approval. Pursuant to §10-417(f), LDC, the following criteria are evaluated:

(f) *Minimum criteria for the issuance of site plan approval.* The development review committee shall determine whether a transitional residential facility approval shall be granted based on the finding that the following minimum criteria have been satisfied:

(1) The operation and location of the facility as proposed is consistent with the comprehensive plan and applicable land development regulations;

(2) The facility would not create or cause a private nuisance, including but not limited to noise, odor, health hazard, glare and unlawful activities, to adjacent properties;

(3) The facility will implement adequate security and supervision measures to address the needs of the facility's residents as well as residents of adjacent lands and their property;

(4) The facility is served by or easily accessible to mass transit;

(5) The facility will be of adequate size and design to reasonably accommodate its projected capacity;

(6) The facility and its features are designed to be compatible with the general architecture theme, appearance and representative building types of adjacent properties and uses; and

(7) The intensity of use of the proposed facility does not unreasonably adversely impact upon existing uses or change the character of the area in which it is located. Intensity of the use of the proposed facility shall be determined based upon its size, the number and type of accessory services to be provided, either by

> itself or in conjunction with other group homes, community residential homes, and transitional residential facilities located within a 2,400-foot distance of the site boundaries. Adverse impacts shall be evaluated particularly with respect to existing residential uses and districts within 500 feet of the site.

42. The procedures for administrative review of Type B Site Plan applications are set forth in §9-155 of the Tallahassee LDC. A copy of §9-155, LDC is attached as Exhibit "2" to this Complaint.

43. The administrative procedures specify that the application will be considered at a public hearing before the City's Development Review Committee ("DRC"). Withing five days of the hearing, the chair of the DRC is instructed to issue a "preliminary decision" which includes "an itemized list of findings of fact which support approval, approval with conditions, or denial of the application". *See*, §9-155(10)(j), LDC.

44. In the event that the DRC imposes conditions on the site plan, the applicant is provided an additional 90 days to submit its revisions. The DRC will then issue an approval of the revised plan, but not until "written authorization from each development review committee member of his/her designee has been provided to indicate that the site plan meets the conditions of approval required by the development review committee." *See*, §9-155(10)(k), LDC.

45. The preliminary decision of the DRC becomes final unless an interested party files an administrative appeal seeking a "quasi-judicial proceeding" as provided in §9-15510(l), LDC.

46. If an applicant requests a quasi-judicial proceeding to challenge the DRC preliminary decision, those proceedings are governed by "chapter 2, article III, division 2, subdivision II, of this Code and the bylaws of the planning commission." *See*, §9-155(10)(l), LDC.

47. The applicable provisions of the Land Development Code which coincide with "chapter 2, article III, division 2, subdivision II" are §§2-131 through 2-139. The core provisions governing the quasi-judicial hearing appear at §2-138 of the Tallahassee LDC. A copy of Subdivision II. - Quasi-Judicial Proceedings, §§2-131 through 2-139, LDC is attached as Exhibit "3" to this Complaint.

48. In summary, administrative review is conducted as follows:

A. An Administrative Law Judge ("ALJ") assigned by the Florida Division of Administrative Hearings (under contract with TALLAHASSEE)[5] conducts a public evidentiary hearing. *See*, §2-138(i), LDC. The hearing is a *de novo* proceeding.[6]

B. At the conclusion of the evidentiary hearing, the parties submit proposed recommended orders. *See*, §2-138(j), LDC.

C. The ALJ subsequently issues his proposed recommended order which "shall approve or deny, in whole or in part, the request of the petitioner; and shall include findings of fact and conclusions of law, separately stated within the recommended order." *See*, §2-138(j), LDC.

D. The parties are then permitted to file exceptions to the recommended order with the clerk of the Planning Commission. *See*, §2-138(k), LDC.

E. The matter is referred to the Planning Commission which conducts a public hearing, but takes no new evidence. *See*, §§2-138(m), (n), LDC.

F. The proceedings before the Planning Commission are governed by §2-138 of the City's Land Development Code as well as By-Laws enacted by the Planning Commission. The

---

[5] *See*, §2-138(d), LDC.

[6] *See*, §2-135(a), LDC.

relevant portion of the By-Laws relative to administrative proceedings governing approval of Type B Site Plans for Transitional Residential Facilities are found in Article IX. A copy of Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission ("the By-Laws") is attached as Exhibit "4" to this Complaint.

G. At the conclusion of the hearing, the Planning Commission is directed to "adopt the recommended order, adopt the recommended order with changes, or direct staff to prepare a revised order." The Planning Commission also has the option of remanding the case to the ALJ for further factual findings. *See*, §§2-138(m), (n), LDC.

H. A disappointed applicant can seek review of the Planning Commission's order through a certiorari proceeding in state circuit court. *See*, §§2-138(o), LDC.

**DENIAL OF CITY WALK'S APPLICATION**

49. Plaintiffs present largely facial constitutional challenges to the CITY's Land Development Code and to the Planning Commission's By-Laws. As such the individual facts of this case are irrelevant except to show standing to raise those claims. *See, e.g.*, Miami Herald Pub. Co. v. City of Hallandale, 734 F.2d 666, 674 (11th Cir. 1984).

50. CITY WALK first provided services to the homeless on an emergency basis, at the CITY's specific request, in order to ameliorate the shortage of beds during "cold nights" in 2020.

51. CITY WALK opened its doors to the homeless at the end of November, 2020.

52. CITY WALK began its religious ministry to the homeless, including the speech activities addressed above, as soon as it opened its doors.

53. On April 1, 2021, the CITY held a hearing before its code enforcement magistrate to fine CITY WALK for operating its homeless mission without first having secured approval of

a Type B Site Plan. Those proceedings concluded with the entry of a fine against CITY WALK.[7]

54. CITY WALK submitted its application for Type B Site Plan approval on or about February 8, 2021.

48. The Development Review Committee entered its preliminary denial of CITY WALK's application on March 9, 2021.

49. Contrary to the CITY'S own Code, the DRC Order did not contain any findings of fact. Instead, it merely stated that "the application did not meet all of the criteria required by Section 10-417, as well as other pertinent sections, of the Tallahassee Land Development Code…".

55. CITY WALK took a timely appeal of the DRC preliminary denial.[8]

56. Plaintiffs RENEE MILLER and ANTHONY MILLER testified at the evidentiary hearing as principals of CITY WALK, as fact witnesses and to speak of their own personal faith and involvement in the mission.

57. After a two-day evidentiary hearing, the ALJ entered a Recommended Order on November 19, 2021 concluding the CITY WALK met all of the Code criteria and that it was entitled to approval of its Type B Site Plan.

58. The ALJ included certain conditions on the approval of City Walk's site plan (including occupancy limits, security arrangements and temporal restrictions) which he found

---

[7] CITY WALK appealed the code enforcement orders which were upheld by the state Circuit Court on November 4, 2021. Accordingly, those state enforcement proceedings have been fully concluded. CITY WALK filed an "England Reservation of Rights" in the Circuit Court proceedings on May 24, 2021, notifying the CITY of its intention to litigate its constitutional claims in Federal Court. *See, generally*, Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1305 (11th Cir. 1992).

[8] CITY WALK filed an "England Reservation of Rights" in the proceedings before the ALJ on May 24, 2021 reserving its Federal claims for adjudication in this Court.

would allow for the effective operation of a Transitional Residential Facility in harmony with the neighborhood.

59. A public hearing was held before the Planning Commission on January 12, 2022.

60. On a vote of 3-2, the Planning Commission rejected the ALJ's Order. The Planning Commission did not suggest alternative criteria or additional criteria which would allow for the operation of City Walk's mission – it simply rejected the site plan outright.

61. The Planning Commission entered its Final Order on January 27, 2022.

62. The Planning Commission Final Order represents the conclusion of all administrative remedies available to the Plaintiffs.

**SUMMARY OF CONSTITUTIONAL CLAIMS**

63. Defendant imposes an unconstitutional restraint on the exercise of Plaintiffs' religious beliefs and practices in violation of the Free Exercise Clause of the First Amendment.

64. Defendant imposes an unconstitutional prior restraint on speech because there are no locations anywhere in the City of Tallahassee where a religious homeless mission can operate as a matter of right. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) and Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999) control this inquiry.

65. Pursuant to §10-417, a person wishing to open and operate a religious mission providing care and residential services to the City's homeless must first obtain permission from the CITY.

66. The criteria set forth in §10-417 for the evaluation of Type B Site Plan applications are vague, subjective and confer unfettered discretion on governmental decisionmakers in violation of the First Amendment.

67. The criteria set forth in §10-417 for the evaluation of a Type B Site Plan application are so vague that they allow for arbitrary and discriminatory enforcement in violation of the Due Process Clause.

68. The procedures for evaluating a Type B Site Plan application are principally set forth in §2-138(i), LDC and Article IX of the Planning Commission's By Laws.

69. Those procedures are constitutionally defective for the following reasons:

A. They do not guarantee a decision within a specified brief period of time; in many cases there are no specified times at all and, in other cases, the time periods are illusory because the applicant is not allowed to speak if a decision is not forthcoming.

B. The delays built into the administrative process necessarily mean that a decision cannot be reached within a reasonable period of time.

C. In the case of CITY WALK, the procedures do not preserve the *status quo*.

D. The administrative process is so cumbersome that it interferes with prompt judicial review and prompt judicial disposition. *See, generally*, City of Littleton, Colorado v. Z.J. Gifts, D–4., L.L.C., 541 U.S. 774 (2004).

70. The CITY's criteria for evaluating Type B Site Plan approvals is not narrowly tailored in the context of religious missions. There are readily available alternatives available both in terms of site location and in terms of substantive criteria which would preserve the government's interests without burdening speech as severely as the current regulations do.

71. The CITY fails to provide sufficient sites to allow religious missions providing transitional residential services to open and operate. Plaintiffs allege the following particulars:

A. The Tallahassee Code sets up an impossible Catch-22 for religious missions: transitional residential facilities must not be located too close to residences[9] but they also must be cited near public transportation such as bus stops[10] which are invariably located near residential areas.

B. The criteria used to deny CITY WALK's application – namely a change in the character of the neighborhood – applies to any other location where CITY WALK may apply for permission to operate; there are no conforming locations in the City which would not experience a change in character of the community.

C. Transitional residential facilities are barred from industrial districts which are effectively the only zones (other than rural agriculture lacking in infrastructure) where transitional residential facilities can be screened or segregated from commercial and residential neighbors.

**ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF**

72. The Plaintiffs' speech rights have been infringed as Defendant has actively enforced its Ordinances against them by fining CITY WALK and by withholding permission for their religious mission.

73. Plaintiffs' speech rights have been chilled now, and in the future, because they risk further fines, enforcement actions and even imprisonment if they persist in their speech and

---

[9] Section 10-417(f)(7) provides that special care must be taken so as not to impact local residential uses:

> Adverse impacts shall be evaluated particularly with respect to existing residential uses and districts within 500 feet of the site.

[10] *See*, §10-417(f)(4) ("The facility is served by or easily accessible to mass transit…").

religious activities.[11]

74. On January 14, 2022, the City's Attorney issued a press release threatening to bring legal action against CITY WALK in order to shut down its operations and censor its speech. The City's Attorney stated:

> The City of Tallahassee is taking steps to initiate appropriate enforcement action concerning the continued operation of an unpermitted homeless shelter by City Walk – Urban Mission on Mahan Drive.
> …
> If the violations are not immediately abated, the City will commence enforcement action concerning the Building Code violations and evaluate all potential legal action to remedy the violations.

Tallahassee Reports, *City of Tallahassee "Taking Steps" to Initiate Enforcement Against City Walk,* (Jan. 14, 2022), https://tallahasseereports.com/2022/01/14/city-of-tallahassee-taking-steps-to-initiate-enforcement-against-city-walk/ (last accessed 2/3/22).

75. Unless the Ordinances, policies and practices of Defendant are enjoined by this Court, the Plaintiffs will suffer the continuing loss of their constitutional rights.

76. Plaintiffs have suffered irreparable injury and continue to suffer irreparable injury as a result of the Defendant' Ordinances, policies and practices.

77. None of the Plaintiffs has a plain, adequate or complete remedy to protect their constitutional rights and to redress the wrongs and illegal acts complained of, other than

---

[11] Section 1-7 of the Land Development Code provides for incarceration as a potential penalty:

> (c) Except as otherwise provided by law or ordinance, a person convicted of a violation of this Code shall be punished by a fine of not more than $500.00, imprisonment for a term not exceeding 60 days, or any combination thereof. If a violation of this Code is also a violation of state law, the violation shall be punished in the same manner and within the same limits as are prescribed for such violation of state law.

immediate and continuing injunctive relief.

78. Plaintiffs have no adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, damages are both inadequate and unascertainable.

79. The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendant, which interfere with the public's rights guaranteed under the First Amendment.

80. A permanent injunction will preserve Plaintiffs' civil rights and will minimize the need to award extensive compensatory damages.

**DAMAGES AND ATTORNEY'S FEES**

81. Because of the Defendant' actions, Plaintiffs' First Fourteenth Amendment rights have been violated and Plaintiffs are faced with similar and repeated violations of their rights in the future if they do not abandon their speech and religious activities.

82. CITY WALK has suffered economic losses as a result of the enforcement of the Defendant' ordinances, policies and practices against it. Those damages include:

A. The imposition of code enforcement fines.

B. Reduction in donations as a result of potential donors worrying about the closure of the City Walk mission or the possible loss of tax exempt status for the mission.

C. Opportunity costs in the form of increased interest and cost of materials due to their inability to renovate the facilities (CITY WALK cannot obtain the necessary building permits without approval of its Type B Site Plan application).

83. Plaintiffs have retained Benjamin, Aaronson, Edinger & Patanzo, P.A. and Dudley, Sellers, Healy & Heath, PLLC as their attorneys to represent them in this action and have agreed to pay them a reasonable fee, which fee Defendant must pay pursuant to 42 U.S.C. §1988.

**COUNT I**
**THE DEFENDANT'S ORDINANCES AND PROCEDURES IMPOSE AN UNCONSTITUTIONAL PRIOR RESTRAINT ON SPEECH**

84. Plaintiffs reallege the facts set forth in Paragraphs 1 through 83 and incorporate those facts into this Count by reference.

85. This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against Defendant CITY OF TALLAHASSEE under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

86. Plaintiffs are uncertain as to their rights and remedies under the Tallahassee Land Development Code and the By-Laws as they have been applied to Plaintiffs in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

87. Section 10-417 of the Tallahassee Land Development Code imposes a prior restraint because Plaintiffs cannot engage in their religious speech (i.e. the operation of a residential mission for the homeless with the associated expressive and speech components described above) without first obtaining the CITY's permission in the form of Type B Site Plan approval.

88. The restraint imposed by §10-417, and the associated procedures for administrative review, is unconstitutional on its face because the ordinances fail to include all of the substantive and procedural safeguards required by FW/PBS, Inc. v. City of Dallas, 493 U.S.

215, 110 S.Ct. 596 (1990) and Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999)

89. The criteria for evaluating Type B Site Plan applications set forth in §10-417(f), LDC are utterly standardless and afford the DRC and Planning Commission, total, unbridled discretion in violation of the First Amendment. Plaintiffs allege the following particulars:

A. The LDCs confer upon the planning director the discretion to determine in the first instance whether an application "contains all required information *at the required level of detail*" (emphasis added). *See*, §9-155(10)(c).

B. Even after a determination of completeness by the DRC director, other members of the DRC can suspend review of the application indefinitely by demanding additional unspecified and indeterminate information from the applicant:

> j. Development review committee review. The development review committee shall … request additional material and data *determined to be necessary to undertake the required review* and continue its review to a date and time certain.

§9-155(10)(j).

C. Growth management staff can halt the processing of any application upon a determination that the property has not been "properly posted":

> e. The property that is the subject of the application shall be prominently posted by the applicant pursuant to the policies and procedures of the growth management department. An application shall not be determined complete until the department has verified that the property is properly posted.

*See*, §9-155(10)(e). The LDCs do not themselves establish any standard for posting and the Growth Management Department's criteria employ vague language: "prominently displayed", "clearly visible' and "centrally located". *See*, Sign Posting Affidavit., https://www.talgov.com/Uploads/Public/Documents/growth/forms/sign_posting_affidavit.pdf (last accessed 2/2/22).

D. The criteria for evaluating a license are completely open-ended and almost entirely subjective in nature. Section 10-417(f) includes imprecise criteria, both collectively and in every subpart, including the following:

(1) Section 10-417(f)(1): "consistent with the comprehensive plan";

(2) Section 10-417(f)(2): "adequate" security;

(3) Section 10-417(f)(3): a general prohibition against "unlawful activities";

(4) Section 10-417(f)(4): "easily accessible" to transit;

(5) Section 10-417(f)(5): the facility must be of "adequate size";

(6) Section 10-417(f)(6): "compatible with the general architecture theme, appearance and representative building types of adjacent properties and uses";

(7) Section 10-417(f)(7): the TRF must not "unreasonably adversely impact upon existing uses or change the character of the area".

E. The criteria are not exclusive; the DRC and the Planning Commission can attach additional unspecified "conditions" to their approval with no substantive limits whatsoever on those conditions:

(1) In the first instance, the DRC can attach whatever conditions to the site plan it may choose in its unfettered discretion:

> j. Development review committee review. The development review committee shall review the plans at their next regularly scheduled meeting, prepare and submit to the chair a preliminary decision with an itemized list of findings of fact which support approval, *approval with conditions*, or denial of the application; (emphasis added).

§9-155(10)(j), LDC.

(2) The DRC has the unfettered discretion to determine whether revisions to an application to meet any "conditions" are satisfactory to its individual members:

> k. Site plan revisions. The director shall not sign the site plan until written authorization from each development review committee member of his/her designee has been provided to indicate that the site plan meets the conditions of approval required by the development review committee.

§9-155(10)(k), LDC.

(3) The DRC can require that the applicant sign a development agreement with the School Board as a condition for approval, thereby creating a third party heckler's veto over any development:

> If a school proportionate fair-share mitigation development agreement is required as a condition of approval, the growth management director shall not sign the revised site plan submittal until the development agreement has been executed by all parties.

§9-155(10)(k), LDC.

(4) At the conclusion of any administrative appeal from the DRC's preliminary decision, the Planning Commission can reject the ALJ's recommended order and attach whatever conditions it deems appropriate in its unfettered discretion:

> (n) The planning commission shall adopt the recommended order, *adopt the recommended order with changes*, or direct staff to prepare a revised order. (emphasis added).

§2-138(n), LDC.

(5) The same unconstrained discretion to revise the ALJ order is afforded to the Planning Commission in its own By-Laws:

> (g) Action on the Recommended Order. The Planning Commission shall adopt the recommended order, *adopt the recommended order with changes*, or direct staff to
> prepare a revised order. (emphasis added).

Art. IX, §10(g), By-Laws.

90. The CITY's Land Development Code and the By-Laws fail to guarantee that a decision on a Type B Site Plan application will be made within a specified brief period of time

(or any period of time at all). The procedural defects occur at every level of the ordinances and By-Laws with multiple administrative cul-de-sacs and a series of illusory time standards. In addition, the ordinances and By-Laws fail to guarantee that speech will be permitted if the decision is not rendered within the nominal times identified in the procedures. Plaintiffs allege the following particulars:

A. Certain steps in the application process do not have a fixed deadline in terms of days, but are indeterminate, with the opportunity for continuances which are also not constrained by deadlines. Those steps and the associated code provision are as follows:

(1) According to policies published and promulgated by the City of Tallahassee Growth Management Department, the CITY will not even accept an application for Type B Site Plan approval until the applicant obtains a "Land Use Compliance Certificate".

> Prior to submitting a Type B Site Plan, you must apply for and receive a Land Use Compliance Certificate….

Application Submittal and Review Information - Land Use | Site Plan/Subdivision - Type B Site Plan Review, https://www.talgov.com/growth/growth-apps-landuse.aspx (last accessed 2/2/22). There are no provisions in the LDCs or in the Growth Management policies which guaranty that a "Land Use Compliance Certificate" will be issued within any specified period – or ever.

(2) The same lack of time periods applies to the requirement that an applicant obtain a Natural Features Inventory from the CITY – something which City staff can withhold indefinitely in their discretion:

> … Also, a Natural Features Inventory (NFI), required by Chapter 5 of the City of Tallahassee Land Development Code, must be applied for, unless otherwise exempted by the Growth Management Department. The NFI must be approved or conditionally approved prior to the acceptance of the site plan application.

Type B Site Plan Review, https://www.talgov.com/growth/growth-apps-landuse.aspx (last accessed 2/2/22).

(3) Review by the DRC does not occur within a specified period of time. Instead, the review takes place "at their next regularly scheduled meeting" – whenever that may occur. However, even that flexible time standard is contingent and subject to continuance as provided by the CITY's ordinances and policies:

(a) Placement on the "next regularly scheduled meeting" is conditional as the application must be filed at least 30 days before the next meeting. *See*, Type B Site Plan Review, https://www.talgov.com/growth/growth-apps-landuse.aspx (last accessed 2/2/22) ("The deadline for filing an application with the DRC is generally 30 days prior to the meeting.").

(b) The DRC is not required to approve or deny the application at its hearing, but can extend the process indefinitely by requesting "additional material and data determined to be necessary to undertake the required review". *See*, §9-155(10)(j).

(c) In the event that additional information is demanded, the DRC can continue the hearing indefinitely with the only requirement being that they fix "a date and time certain" – which could be year later. *See*, §9-155(10)(j).

(d) In the event that the DRC requires revisions to the Type B Site Plan application [as permitted by §9-155(10)(j)], approval of the DRC can be delayed indefinitely as the director is not permitted to sign the preliminary decision until the member of the DRC verify compliance with the new conditions; there is no requirement that they do so within any fixed time:

> The director shall not sign the site plan until written authorization from each development review committee member of his/her designee has been provided to indicate that the site plan meets the conditions of approval required by the development review committee.

§9-155(10)(j), LDC.

(4) In all cases where a "school proportionate fair-share mitigation development agreement", the DRC will not render a decision until the applicant signs an agreement with the School Board, a third party. The School Board is not required to tender its signature within any specified period of time and that delay can lead to the automatic termination of the application: "Failure by the applicant to submit a revised site plan within the time frames specified in this subsection shall deem the site plan null and void." *See*, §9-155(10)(k), LDC.

(5) In the event of a preliminary denial of a Type B Site Plan application by the DRC, the Code does not provide a specific period of time within which the ALJ must conduct the public hearing. While the public hearing must nominally *commence* within 60 days [§2-138(i)(1), LDC] , the ALJ can continue the hearing as often and for as long as he or she chooses:

> (10) The administrative law judge may order the hearing continued until a date certain if necessary to obtain additional information necessary for determination of the matters at issue.

§2-138(j)(10), LDC.

(6) The LDCs do not include a specified time within which the Planning Commission must conduct a hearing on the ALJ's recommended order; the code merely instructs the clerk to schedule a hearing:

> (l) Upon receipt of the recommended order from the administrative law judge, and after the deadline for receipt of exceptions thereto, the clerk of the planning commission shall schedule the recommended order for consideration by the planning commission.

§2-138(l), LDC.

(7) The By-Laws do not establish a fixed deadline for conducting the Planning Commission's review of the ALJ's recommended order. Instead, the By-Laws simply state that the hearing will take place "at the next available regularly scheduled Planning Commission Meeting". That standard is both indefinite and illusory for the following reasons:

(a) The By-Laws do not actually require that the hearing be scheduled at the next scheduled meeting of the Planning Commission. Rather, the language is qualified by the adjective "*available*", leaving the actual determination of availability to the discretion of the clerk or the Planning Commission. *See*, Art. IX, §10(e), By-Laws.

(b) The By-Laws allow the CITY to move to continue the proceedings for an indefinite period of time with the decision left to the sole discretion of the Planning Commission. *See*, Art. IX, §9(1), By-Laws.

(c) There are no consequences if the Planning Commission fails to schedule the hearing at its next available meeting – or at any time.

(8) The Planning Commission is not actually required to render its decision within any specified period of time. Both the LDCs and the By-Laws include identical provisions stating that the Planning Commission will *consider* the recommended order at a public hearing, there is no requirement that they actually render a decision at the meeting or at any other time:

> (m) During its consideration of the recommended order at a duly notified public hearing, the planning commission will take comment from any parties who desire to submit comments in favor of or in opposition to the recommended order….
>
> (n) The planning commission shall adopt the recommended order, adopt the recommended order with changes, or direct staff to prepare a revised order.

§2-138(m), (n), LDC.

> (f) Consideration of the Recommended Order. During its consideration of the recommended order at a duly noticed public hearing, the Planning Commission will take comment from the parties and the public…
>
> (g) Action on the Recommended Order. The Planning Commission shall adopt the recommended order, adopt the recommended order with changes, or direct staff to prepare a revised order.

By-Laws, Art. IX, §10(f), (g).

(9) Both the LDCs and the By-Laws authorize the Planning Commission, in its discretion, to remand a recommended order to the ALJ for further factual findings:

> (n) … The planning commission may also remand the recommended order to the administrative law judge, if additional findings are necessary.

§2-138(n), LDC.

> (g) Action on the Recommended Order. … The Planning Commission may also remand the recommended order to the administrative law judge if additional findings are necessary.

By-Laws, Art. IX, §10(f), (g). However, neither of those sources prescribes any definite time period within which the ALJ must conduct additional fact-finding or render a revised Recommended Order.

B. None of the procedures provides a mechanism by which an applicant can force an administrative decision at any point.

C. None of the provisions guaranty that speech will occur if the administrative process, approval or hearing does not occur within the nominal deadlines specified in the LDC and By-Laws. That is, in those cases where a deadline of some kind is mentioned in the code, there are no consequences for an intentional or inadvertent failure to act on the part of the permitting officials. Those choke points include, at a minimum:

(1) The initial application cannot move forward until the planning director determines that the application is complete. While a nominal period of five days is specified in

the Code, the Codes does not state what happens if the director fails to make a decision within that time and no mechanism is provided to advance the application in the absence of a determination. *See*, §9-155(10)(c) ("Within five days after receipt of an application for site plan approval, the director shall determine whether the application contains all required information at the required level of detail.").

(2) There are public notice requirements at every level of the proceedings. *See, e.g.*, §§9-155(10)(d)-(g), §§2-138(i)(3), (m); Art. IX, §3(e), (f), By-Laws. Because those notices are mandatory, it appears that proceedings cannot be held of the notice is not given or is not given in a timely fashion.

(3) Administrative review of a preliminary denial by the DRC cannot take place until such time as the Planning Commission's attorney determines that the applicant has standing.[12] While the Code provides that the decision shall be made within five days, the review cannot move forward if the attorney does not act. *See*, §2-137. Determination of standing, LDC; Art. IX, §1(k), By-Laws.

(4) The LDCs instruct the ALJ to render his recommended order is due "within 30 calendar days of the date of the hearing." §2-138(j), However, that time standard is illusory for two reasons:

(a) The Code allows the ALJ to continue the hearing from time to time in his discretion; without a fixed date for ending the administrative hearing, there is no fixed time when the 30 day clock will begin to run.

[12] The Code states that a record must be compiled before the ALJ can conduct his hearing and the determination of standing is a mandatory component of the record. *See*, §2-138(i)(5)a.

(b) There are no consequences in the event that the ALJ fails to enter his order within the specified time. In particular, speech may be delayed indefinitely if the ALJ does not rule in a timely fashion.

(5) There are no time standards within the LDC or the By-Laws which require the Planning Commission to actually render a decision within any particular period of time.

91. Even if the Type B Site Plan applicant follows the specified administrative procedure exactly, without undue delay at any point, the total time to complete the administrative process is unreasonably long and is the antithesis of a brief period. In Plaintiffs' case that process took nearly a full year (Plaintiffs submitted their application on February 8, 2021 and the Planning Commission did not enter its Final Order under January 27, 2022).

92. The LDC and By-Laws do not allow speech to occur (in this case, the operation of a religious residential mission) if the CITY, the DRC, the ALJ or the Planning Commission fail to make a determination within a brief period of time.

93. The failure to guarantee a decision within a specified period of time and the multiple opportunities for continuance and delay allow the Defendant to defer approval of a Type B Site Plan application indefinitely; speech can be denied during that time simply by taking no action at all.

94. The Ordinance fails to preserve the *status quo* as required by FW/PBS.

95. In the context of this case, Plaintiffs' religious mission, and their associated speech rights, can be shut down and censored indefinitely because the CITY has withheld permission to speak (in the form of Type B Site Plan approval).

96. Because there is no requirement that the CITY, the DRC, the ALJ or the Planning Commission make a decision on Type B Site Plan application within a specified time, the Defendant can delay the administrative decision indefinitely, thereby thwarting judicial review.

97. Because Florida has a requirement that all administrative remedies be exhausted before a litigant can seek review in Court, the indefinite period for review and approval precludes judicial review and makes a prompt judicial disposition impossible in contravention of the standards adopted in City of Littleton, Colorado v. Z.J. Gifts, D–4., L.L.C., 541 U.S. 774, 124 S.Ct. 2219 (2004).

98. Plaintiffs have a right to have this Court declare their rights under the First Amendment as those rights are restricted and infringed by the ordinances, policies and practices complained of herein.

WHEREFORE, Plaintiffs pray for the following relief:

A. That this Court take jurisdiction over the parties and this cause.

B. That this Court enter a judgment declaring that §10-417 of the Tallahassee Land Development Code, together with the associated procedures for approval of Transitional Residential Facilities [§§2-138, 9-155, LDC and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission] are unconstitutional on their face and as applied to the Plaintiffs because they impose a prior restraint without the procedural and substantive protections required by the First Amendment.

C. That this Court enter a judgment declaring that Plaintiffs are free to operate a religious residential mission at their current location without having to secure zoning approval from the City of Tallahassee under §10-417, LDC because such discretionary zoning violates the Free Speech Clause of the First Amendment on its face and as applied to the Plaintiffs.

D. That this Court enter a permanent injunction forever enjoining Defendant and its various agents and employees, from enforcing §10-417, LDC and the requirement for Type B Site Plan approval against Plaintiffs and all other similarly situated persons.

E. That this Court enter a judgment for compensatory and nominal damages sufficient to compensate the Plaintiffs for violations of their First Amendment rights.

F. That this Court award Plaintiffs their recoverable costs, including a reasonable attorney's fee pursuant to 42 U.S.C. §1988; and

G. That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

**COUNT II**
**THE DEFENDANT'S ORDINANCES AND PROCEDURES VIOLATES THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT**

99. Plaintiffs reallege the facts set forth in Paragraphs 1 through 83 and incorporate those facts into this Count by reference.

100. This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against Defendant CITY OF TALLAHASSEE under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

101. Plaintiffs are uncertain as to their rights and remedies under the Tallahassee Land Development Code and the By-Laws as they have been applied to Plaintiffs in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

102. Plaintiffs have a right to Free Exercise of their religious faith through words, practices and acts.

103. In this instance, Plaintiffs express their religious faith through the operation of the CITY WALK religious mission catering to Tallahassee's homeless population.

104. Plaintiffs' faith and their religious observance of Christ's message is inextricably linked to the operation of a religious mission catering to the homeless.

105. Tallahassee is an appropriate place for the exercise of Plaintiffs' religious faith because Plaintiffs reside in the community and because the City of Tallahassee has an enormous unmet need for the care, housing and counseling of the homeless.

106. The CITY WALK facilities are an appropriate location for the exercise of Plaintiffs' religious practices for the following reasons:

A. It is located on a major U.S. Highway with ready access to mass transit;

B. The property and the buildings are sufficiently large to address all of Plaintiffs' religious practices from their church, to their counseling offices, to the kitchen and dining facilities, to the residential needs of the City's homeless.

C. The location is isolated from nearby residences by the U.S. Highway (Mahan Drive) in the front; by a steep ditch and railroad tracks to the rear; and by commercial uses on either side.

D. The property is zoned OR-2 which allows for a wide variety of uses, including a church.

E. The City has already determined that a Transitional Residential Facility may be located in an OR-2 zone.

F. After diligent search with the active assistance of a local Realtor, Plaintiffs concluded that there are few or no other sites within the City of Tallahassee which provide a comparable mix of location, facilities, access and economy as the City Walk facility.

G. The CITY actively encouraged Plaintiffs to operate a "low barrier" emergency homeless shelter at this very location during the winter of 2020-21.

107. The City now seeks to prevent Plaintiffs from freely exercising their religious rights through imposition of code enforcement fines, by requiring Plaintiffs to obtain Type B Site Plan approval prior to engaging in their religious practices, and by withholding approval of that site plan.

108. Section 10-417, LDC is not a law of general application because it applies only to those persons wishing to operate a transitional residential facility.

109. While not every transitional residential facility is associated with religious expression, every religious observer seeking to operate a residential mission for the homeless is treated by the City as a Transitional Residential Facility.[13]

110. The exercise of Plaintiffs' religious beliefs and practices have been inordinately burdened by §10-417, LDC and the associated procedures for approval of a Type B Site Plan.

111. §10-417, LDC and the associated procedures for approval of a Type B Site Plan impose an unconstitutional prior restraint on the Free Exercise of Plaintiffs' religious rights for the reasons set forth above.

112. There are readily available alternatives to the flat denial of Plaintiffs' religious freedoms which are less restrictive of their Free Exercise rights.

113. The operational conditions suggested by the ALJ in this matter represent a good-faith application of neutral zoning principles which would accommodate Plaintiffs' religious practices.

---

[13] A recent study shows that the majority (58%) of the shelter beds provided for the homeless are furnished by religious institutions. *See,* Johnson, Byron, Baylor Institute for Studies of Religion, *Assessing the Faith-Based Response to Homelessness in America: Findings from Eleven Cities,* (2017) at 20, accessible at https://socialinnovation.usc.edu/homeless_research/assessing-the-faith-based-response-to-homelessness-in-america-findings-from-eleven-cities/ (last accessed 2/4/22).

114. Plaintiffs have a right to have this Court declare their rights under the First Amendment as those rights are restricted and infringed by the Ordinances, policies and practices complained of herein.

WHEREFORE, Plaintiffs pray for the following relief:

A. That this Court take jurisdiction over the parties and this cause.

B. That this Court enter a judgment declaring that §10-417 of the Tallahassee Land Development Code, together with the associated procedures for approval of Transitional Residential Facilities [§§2-138, 9-155, LDC and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission] are unconstitutional on their face and as applied to the Plaintiffs because they impose unduly burden the Free Exercise of their religious faith in violation of the First Amendment.

C. That this Court enter a judgment declaring that Plaintiffs are free to operate a religious residential mission at their current location without having to secure zoning approval from the City of Tallahassee under §10-417, LDC because such discretionary zoning violates the Free Exercise Clause of the First Amendment on its face and as applied to the Plaintiffs.

D. That this Court enter a permanent injunction forever enjoining Defendant and its various agents and employees, from enforcing §10-417, LDC and the requirement for Type B Site Plan approval against Plaintiffs and all other similarly situated persons.

E. That this Court enter a judgment for compensatory and nominal damages sufficient to compensate the Plaintiffs for violations of their First Amendment rights.

F. That this Court award Plaintiffs their recoverable costs, including a reasonable attorney's fee pursuant to 42 U.S.C. §1988; and

G. That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

**COUNT III**

**THE DEFENDANT'S ORDINANCES AND PROCEDURES INFRINGE UPON THE FIRST AMENDMENT RIGHT OF FREE ASSOCIATION**

115. Plaintiffs reallege the facts set forth in Paragraphs 1 through 83 and incorporate those facts into this Count by reference.

116. This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against Defendant CITY OF TALLAHASSEE under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

117. Plaintiffs are uncertain as to their rights and remedies under the Tallahassee Land Development Code and the By-Laws as they have been applied to Plaintiffs in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

118. Plaintiffs religious beliefs and practices command them to enjoy the fellowship of their less fortunate neighbors.

119. In order to communicate their religious beliefs and to cater to the physical and spiritual needs of the homeless, Plaintiffs must have a physical space where they can gather their congregation and those who are served by the City Walk Mission.

120. That is to say, Plaintiffs' speech and religious rights have little meaning unless they can gather and associate with others of like mind as well as with the population to be benefited by Plaintiffs' faith activities.

121. Because Type B Site Plan approval is required wherever a Transitional Residential Facility may operate, there is no location in the City of Tallahassee where Plaintiffs

can meet with their congregation and their service community without first obtaining the City's discretionary approval.

122. The CITY has employed §10-417 and the associated procedural rules, policies and practices to fine CITY WALK for operating its religious mission and freely associating with the City's homeless population.

123. The CITY has employed §10-417 and the associated procedural rules, policies and practices to prohibit Plaintiffs from operating their religious mission and associating with the City's homeless population.

124. Plaintiffs' efforts to freely associate with others of like mind, as well as with the population to be benefited by Plaintiffs' faith activities, have been inordinately burdened by §10-417, LDC and the associated procedures for approval of a Type B Site Plan.

125. There are readily available alternatives to the flat denial of Plaintiffs' religious and speech activities which are less restrictive of their Free Association rights.

126. The operational conditions suggested by the ALJ in this matter represent a good-faith application of neutral zoning principles which would accommodate Plaintiffs' right to associate while protecting the government's interests in safe and clean neighborhoods.

127. Plaintiffs have a right to have this Court declare their rights under the First Amendment as those rights are restricted and infringed by the Ordinances, policies and practices complained of herein.

WHEREFORE, Plaintiffs pray for the following relief:

A. That this Court take jurisdiction over the parties and this cause.

B. That this Court enter a judgment declaring that §10-417 of the Tallahassee Land Development Code, together with the associated procedures for approval of Transitional

Residential Facilities [§§2-138, 9-155, LDC and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission] are unconstitutional on their face and as applied to the Plaintiffs because they infringe upon Plaintiffs' First Amendment right of Free Association.

C. That this Court enter a judgment declaring that Plaintiffs are free to operate a religious residential mission at their current location without having to secure zoning approval from the City of Tallahassee under §10-417, LDC because such discretionary zoning unduly infringes upon Plaintiffs' First Amendment right of Free Association.

D. That this Court enter a permanent injunction forever enjoining Defendant and its various agents and employees, from enforcing §10-417, LDC and the requirement for Type B Site Plan approval against Plaintiffs and all other similarly situated persons.

E. That this Court enter a judgment for compensatory and nominal damages sufficient to compensate the Plaintiffs for violations of their First Amendment rights.

F. That this Court award Plaintiffs their recoverable costs, including a reasonable attorney's fee pursuant to 42 U.S.C. §1988; and

G. That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT IV

## SECTION 10-417 VIOLATES THE FIRST AMENDMENT BECAUSE IT PROVIDES INSUFFICIENT ALTERNATIVE AVENUES OF COMMUNICATION

128. Plaintiffs reallege the facts set forth in Paragraphs 1 through 83 and incorporate those facts into this Count by reference.

129. This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against Defendant CITY OF TALLAHASSEE under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

130. Plaintiffs are uncertain as to their rights and remedies under the Tallahassee Land Development Code and the By-Laws as they have been applied to Plaintiffs in violation of the First Amendment to the United States Constitution.

131. The CITY is obligated to provide sufficient locations where a religious mission, like CITY WALK, which caters to the homeless population can open and operate.

132. The City's Zoning Code restricts the location of Transitional Residential Facilities in three ways:

A. They are not permitted in all zoning districts (being prohibited in any industrial zoning);

B. They are subject to discretionary zoning approval under §10-417;

C. There are a host of subjective criteria under §10-417 which effectively limit Transitional Residential Facilities only to those locations which City Staff believe will not affect any residential and commercial properties within a half mile of the Facility.

133. In addition to the subjective criteria applied by potentially hostile City staff, two features of §10-417 make it especially difficult to find locations within the City:

A. Transitional Residential Facilities must be located in proximity to mass transportation [§10-147(f)(4)];

B. Transitional Residential Facilities cannot change the "character" of residential districts within 500 feet [§10-147(f)(7)].

Because mass transport is invariably sited in proximity to residential districts, the zoning code creates an unavoidable Catch-22 for Transitional Residential Facilities; the need to be near bus stops inevitably brings them into conflict with residential neighbors.

134. The CITY has employed the requirement for discretionary approval of Transitional Residential Facilities as the basis to fine CITY WALK and has threatened to close the mission and terminate Plaintiffs' speech and religious rights.

135. Given the requirement for Type B Site Plan approval under §10-417, there are no sites available for Transitional Residential Facilities as of right.

136. Section 10-417 and the accompanying procedures impose a prior restraint on speech because government permission in the form of a Type B Site Plan is required before speech can occur.

137. Because the Type B Site Plan process is discretionary, and therefore unconstitutional, sites subject to that requirement do not "count" for purposes of determining the number of available sites for Transitional Residential Facilities.

138. Given the restrictions of the Zoning Code and the subjective application of the §10-417 there are no sites - or a constitutionally inadequate number of sites - available for Transitional Residential Facilities anywhere with the City of Tallahassee.

139. Failure to provide sufficient locations where First Amendment-protected charitable enterprises may open and operate as a matter of right renders a zoning code facially unconstitutional and unconstitutional as applied to these Plaintiffs.

WHEREFORE, Plaintiffs pray for the following relief:

A. That this Court take jurisdiction over the parties and this cause.

B. That this Court enter a judgment declaring that §10-417 of the Tallahassee Land Development Code, together with the associated procedures for approval of Transitional Residential Facilities [§§2-138, 9-155, LDC and Article IX of the Bylaws of The Tallahassee-

Leon County Planning Commission] are unconstitutional on their face and as applied to the Plaintiffs because they fail to provide alternative avenues of communication.

C. That this Court enter a judgment declaring that Plaintiffs are free to operate a religious residential mission at their current location without having to secure zoning approval from the City of Tallahassee under §10-417, LDC because such discretionary zoning violates the First Amendment on its face and as applied to the Plaintiffs.

D. That this Court enter a permanent injunction forever enjoining Defendant and its various agents and employees, from enforcing §10-417, LDC and the requirement for Type B Site Plan approval against Plaintiffs and all other similarly situated persons.

E. That this Court enter a judgment for compensatory and nominal damages sufficient to compensate the Plaintiffs for violations of their First Amendment rights.

F. That this Court award Plaintiffs their recoverable costs, including a reasonable attorney's fee pursuant to 42 U.S.C. §1988; and

G. That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

*Respectfully Submitted,*

DUDLEY, SELLERS, HEALY &
HEATH, PLLC

SHAWN M. HEATH, Esquire
Florida Bar No.: 255970
SunTrust Financial Center, Ste 301
3522 Thomasville Road
Tallahassee, Florida 32309
(850) 528-0039
Shawn@DSHattorneys.com

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.

/s/ Gary S. Edinger

GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger12@gmail.com