UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

|  |  |  |
|---|---|---|
| CITY WALK - URBAN MISSION INC.,<br>RENEE MILLER, and ANTHONY MILLER, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO.: |
| vs. | ) ) ) | |
| CITY OF TALLAHASSEE, | ) ) | |
| Defendant. | ) ) ) /| |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Plaintiffs file their Motion for Preliminary Injunction, pursuant to Rule 65, Fed.R.Civ.P. and Rule 7.1 N.D.Fla.Loc.R., and move this Court to enter a preliminary injunction prohibiting the City of Tallahassee from enforcing §§2-138, 9-155, and 10-417 of the Tallahassee Land Development Code, and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission, and in support thereof state:

### MATERIAL FACTS AND SUMMARY OF CLAIMS

1.      Plaintiffs want to worship God and express their religious views through the operation of a religious mission catering to the spiritual and physical needs of their homeless neighbors. Tallahassee is opposed to that activity and has enacted laws and policies which make that religious speech and those religious practices impossible in the City. The City's laws and policies allow bureaucrats the unfettered discretion to approve or prohibit those First Amendment protected activities.

2.      Plaintiffs have filed a Complaint under 42 U.S.C. §1983 asserting that §10-417 of the Tallahassee Land Development Code ("LDC"), and the procedures governing applications for Type B Site Plan approval under the LDC, violate the First Amendment on their face. This Motion is limited to the claims presented in Counts I, II and III of Plaintiffs' Complaint (Free Speech, Free Exercise and Free Assembly) in order to focus on those aspects of the case which are time-sensitive, where the *status quo* must be maintained, and on facial challenges which may be decided without reference to possibly contested facts.[1]

3.      Plaintiffs' core legal claims are facial challenges to the City's ordinances and procedures governing the location of religious missions catering to the homeless. Facial constitutional claims are determined on the basis of the subject ordinance, the Complaint and the Constitution. The individual facts are essentially irrelevant with respect to those facial claims. *See, e.g.*, Miami Herald Pub. Co. v. City of Hallandale, 734 F.2d 666, 674 (11th Cir. 1984).

4.      The facts necessary to show Plaintiffs' standing and to support their constitutional claims are as follows (Doc. 1 at 3-10):

A.      Plaintiffs operate a church and religious residential mission at 1709 Mahan Drive, Tallahassee, Florida. The property is zoned OR-2 and the facilities are large enough to house up to 64 residents.

B.      Plaintiffs' religious ministry caters to the most downtrodden and needy of our fellow citizens – the homeless. Plaintiffs provide food, shelter, and counseling for their residents.  The counseling is expressly religious and spiritual, but Plaintiffs also provide secular

---

[1] Plaintiffs do not waive or abandon the claims asserted in Count IV or any other claims asserted in the Complaint, and specifically reserve the right to seek a determination on the merits of all claims plead.

services in the form of basic mental health and referral services, vocational placement and addiction counseling.

C.       While Plaintiffs' church is nondenominational and open to all who seek it out, it is a Christian church with an expressly Christian message of faith and redemption through Christ.

D.       The operation of a Christian mission for the homeless - including the provision of food and shelter - is utterly incapable of being severed from Plaintiffs' religious faith; it is the very means by which Plaintiffs express their faith. The City Walk religious mission is both the medium *and* the message.

E.       The operation of a Christian mission for the homeless must occur at a particular place; the mission is ultimately rooted in geography as it is the embodiment of God's Word on the physical Earth. In order for Plaintiffs to assemble with their flock, there must be a place which can accommodate that assembly.

F.       Plaintiffs' communicate a specific message which is understood by its audience. That specific communication is Jesus' message of salvation coupled with a reminder that we must be charitable to our neighbors while on Earth.

G.       Plaintiffs selected the property after first scouring the community for an appropriate site. It chose this particular site because it was an appropriate size and it was conveniently located near public transportation - a requirement under the City's Code.

H.       Plaintiffs homeless mission is considered to be a "Transitional Residential Facility" pursuant to §1-2- Definitions, Tallahassee LDC.

5.      Tallahassee does not allow Transitional Residential Facilities anywhere in the City as of right. Instead, any such Facility, including City Walk, must obtain discretionary approval from the City before it can open and operate. (Doc. 1 at 11, ¶¶37-39).

6.      Section 10-417 provides the substantive criteria which the City supposedly applies when considering a Type B Site Plan application. Those criteria are standardless and subjective; the antithesis of a ministerial determination. In addition, the criteria are not exclusive as the LDC allows the City to demand additional information [§9-155(10)(j), (k),  LDC] and to attach unspecified conditions to the approval [§§§2-138(n), 9-155(10)(j), LDC; Art. IX, §10(g), By-Laws].

7.      The procedures for evaluating a Type B Site Plan application are set forth in two largely-overlapping sources of authority: §§2-138 and 9-155 of the Tallahassee LDC, and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission ("By-Laws"). For the reasons addressed at length in Plaintiffs' Complaint (Doc. 1 at 26-33, ¶¶ 90-91) those provisions do not guarantee a decision within a specified brief period of time.

8.      In circumstances where speech and religious practices are already occurring, the City's Ordinances, policies and practices do not preserve the *status quo*. The City can fine Plaintiffs and shut down their operations based on administrative decisions prior to any judicial review. City Walk has already been fined as a consequence of its speech and religious activities. (Doc. 1 at 16, ¶ 53).[2]

---

[2] The code enforcement proceedings and judicial review of the code orders has been fully concluded. There are no pending administrative enforcement actions against Plaintiffs. Plaintiffs properly filed an "England Reservation of Rights" notifying the City of their intention to litigate their Federal claims in Federal Court. (Doc. 1 at 17, ¶ 53, n. 7).

E.       The procedures for administrative review of Type B Site Plan applications are byzantine and lengthy. (Doc. 1 at 14-16, ¶¶ 45-48). Those procedures interfere with judicial review and judicial disposition as administrative appeals are indeterminate and can last as long as a year – as actually occurred in Plaintiffs' case. (Doc. 1 at 33, ¶91).

9.       Plaintiffs' legal arguments may be summarized as follows:

A.       FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) and Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999) control this inquiry.[3] Because a religious residential mission cannot operate anywhere in the City without first obtaining approval from the government in the form of a Type B Site Plan, the City's ordinances impose a prior restraint on Plaintiffs' religious speech and the free exercise of their faith. Section 10-417 and the accompanying procedures are unconstitutional because the decision whether to approve a Type B Site Plan application is not ministerial, but is committed to the unfettered discretion of the permitting officials applying vague and standardless criteria. The procedures are also defective because they do not guaranty a decision within a specified brief period of time, do not preserve the *status quo* and interfere with judicial review.

C.       Section 10-417 imposes both a prior restraint on the Free Exercise of Plaintiffs' religion and an inordinate burden on that constitutional right. As is true with respect to Plaintiffs' speech claims, there are alternative means of regulation which would be less burden-

_____

[3] While it may seem ironic that religious rights would be governed by cases dealing with adult entertainment, the ready transfer of those principles to religious speech and Free Exercise claims is undeniable. *See, e.g.,* Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla., 430 F. Supp. 2d 1296, 1327 (S.D. Fla. 2006) ("Though the Eleventh Circuit's decision in Lady J. Lingerie dealt with the City of Jacksonville's regulation of adult entertainment establishments, it can readily be applied to the instant case, where the First Amendment Free Exercise Clause is implicated by the City of Hollywood's denial of a Special Exception for Plaintiff's house of worship.").

some in terms of Plaintiffs' religious rights.

      B.    Section 10-417 and the accompanying procedures infringe upon Plaintiffs' right of Free Association for much the same reasons: there are no locations where Plaintiffs' can gather with their chosen flock without first securing the government's permission. In addition, the City's Ordinances unnecessarily burden association and are not narrowly tailored given the readily available alternatives means of regulation.

      10.    <u>CERTIFICATE OF GOOD FAITH CONSULTATION</u>.  Undersigned counsel certify that they have consulted with LOUIS C. NORVELL, the attorney likely to appear on behalf of the City, and are advised that the Defendant opposes the relief sought in this Motion.

<strong><u>MEMORANDUM OF LAW</u></strong>

## I.    <u>PRELIMINARY INJUNCTION STANDARD</u>.

      In order to obtain a preliminary injunction, a plaintiff must show the following: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See*, <u>Jones v. Governor of Fla.</u>, 950 F.3d 795, 806 (11th Cir. 2020). Plaintiffs can easily meet each requirement.

      The conditional zoning created by §10-417 obviously imposes an unconstitutional prior restraint which includes none of the substantive and procedural safeguards required by <u>FW/PBS</u>, *supra* and <u>Lady J. Lingerie</u>, *supra*.

## II.    <u>PLAINTIFFS HAVE THE REQUISITE STANDING; THIS CASE IS RIPE; AND THERE ARE NO GROUNDS FOR ABSTENTION</u>.

Plaintiffs clearly have standing to challenge the constitutionality of §10-417 and the

associated procedures as those ordinances, policies and practices have already been applied against them. Plaintiffs actually applied for and were denied a Type B Site Plan in order to operate their religious residential mission and City Walk was fined by the City for operating without one. In addition, the City has threated to bring additional enforcement action against the Plaintiffs in the future. (Doc. 1 at 21, ¶74). *See*, Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1303–06 (11th Cir. 2017).

This case is ripe for adjudication for the same reason why Plaintiffs have standing: a City Ordinance has been applied against them. *See*, Id. at 1304 *quoting* Susan B. Anthony List v. Driehaus, __U.S. __, 134 S.Ct. 2334, 2341 n. 5, (2014) ("This is one of those cases where 'the Article III standing and ripeness issues ... boil down to the same question.'").

There is no plausible reason for this Court to abstain from ruling in this case.[4]

## III.   PLAINTIFFS' SPEECH IS PROTECTED BY THE FIRST AMENDMENT.

The principal question in this case is whether Plaintiffs' religious practices include an expressive element which conveys a message. It is universally understood that the right of free speech is not limited merely to the spoken or written word, but includes "expressive conduct" as well. *See*, Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 (1984) (Sleeping in public for purposes of protest is expressive speech); *Compare*, Phillips v. City of Cincinnati, 479 F.Supp.3d 611, 635 (S.D. Ohio 2020) ("The complaint also asserts that by residing in these visually

---

[4] Abstention would not be proper under Younger v. Harris, 401 U.S. 37 (1971) because there are no pending state enforcement actions involving the Plaintiffs. In addition, Plaintiffs filed a proper England reservation of rights in prior state court proceedings.  This case does not present difficult and unsettled areas of state law so Railroad Comm'n v. Pullman, 312 U.S. 496 (1941) is inapplicable. As the Supreme Court said in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976), "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."

open spaces, Plaintiffs are 'calling attention to the City's affordable housing crisis.' [ ]  Based on these allegations, Plaintiffs have sufficiently pled that by living in the encampments, they were conveying a particularized message - that there is an affordable housing crisis in Cincinnati."). If Plaintiffs' religious beliefs and practices are found to include an element of speech, the issue of whether the City's Ordinances impose an unconstitutional prior restraint becomes almost trivial; it is obvious that the City's laws and procedures do not include the necessary substantive and procedural protections. *See*, FW/PBS, *supra*; Lady J. Lingerie, *supra*; *Compare*, Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla., 436 F.Supp. 2d 1325, 1332–33 (S.D. Fla. 2006) ("Finally, Defendant City conceded that, if the Court found the zoning ordinances at issue to constitute a prior restraint, the holding of Lady J. Lingerie… would control in this case.").

The case law developed in this Circuit and elsewhere in this country holds that the religious practice of ministering to the homeless – feeding them, housing them and caring for their spiritual and physical needs – conveys a powerful message. That message can be religious or secular or both. The Eleventh Circuit recognizes that distributing food – even at a wholly secular event with no religious overtones – often includes an expressive component:

> The district court also failed to consider the context of FLFNB's food sharing events and instead relied on the notion that the conduct must be "combined with other speech" to provide meaning. *See* D.E. 78 at 24. As we explain, the surrounding circumstances would lead the reasonable observer to view the conduct as conveying some sort of message. That puts FLFNB's food sharing events on the expressive side of the ledger.
>
> First, FLFNB sets up tables and banners (including one with its logo) and distributes literature at its events. This distinguishes its sharing of food with the public from relatives or friends simply eating together in the park. *Cf.* Hurley, 515 U.S. at 570, 115 S.Ct. 2338 (holding that participation in a parade was expressive in part because group members "distributed a fact sheet describing the members' intentions" and held banners while they marched).
>
> Second, the food sharing events are open to everyone, and the organization's members or volunteers invite all who are present to participate and to share in their

> meal at the same time. That, in and of itself, has social implications. *See* Mary
> Douglas, "Deciphering a Meal," in Implicit Meanings: Selected Essays in
> Anthropology 231 (1975) ("Like sex, the taking of food has a social component, as
> well as a biological one.").

Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1242 (11th Cir.

2018); *See, also*, Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1293

(11th Cir. 2021). ("To be sure, it seems likely that most expressive food sharings subject to the

Park Rule's regulation will involve some sort of message related to the importance of sharing food

with those in need.").

Speech rights become all the more prominent when the expressive conduct is tied to

religious faith and practices:

> Sometimes, however, an activity that would ordinarily be considered secular takes
> on religious significance. Giving a man a cracker, for example, is often simply a
> way of feeding him, but sometimes it is a sacrament. For TSA, operating the
> Paterson Center is a sacrament. "The program offered at The Salvation Army's
> Paterson Center is neither social nor secular in its purpose. Rather, the operation of
> the Centers is central to the religious mission of The Salvation Army."

Salvation Army v. Dep't of Cmty. Affs. of State of N.J., 919 F.2d 183, 188 (3d Cir. 1990).

Many cases have recognized that churches, religious missions and other religious

organizations have free speech rights which are in addition to and complement their Free Exercise

claims. *See, e.g.*, Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001) (Refusal to allow

Christian club for children to make use of school facilities represented viewpoint discrimination

in violation of the Free Speech Clause); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,

508 U.S. 384 (1993) (Church prevailed on free speech claim where school district would not allow

it access to screen religious oriented films).

Indeed, religious entities sometimes prevail on free speech claims where their Free

Exercise claims either fail or are superfluous. *See, e.g.*, Widmar v. Vincent, 454 U.S. 263, 273

(1981) ("[R]espondents' claim to use that forum does not rest solely on rights claimed under the Free Exercise Clause. Respondents' claim also implicates First Amendment rights of speech and association, and it is on the bases of speech and association rights that we decide this case.").

There are a considerable number of cases which evaluate challenges to zoning laws by religious institutions under intermediate scrutiny – a concept which is related to, but separate from the question of prior restraints.[5] The same time, place and manner analysis that applies to rock concerts, adult entertainment and parade laws find its way into speech claims asserted by churches, mosques and temples. *See, e.g.*, Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 468 (8th Cir. 1991) (Restriction on churches in central business district treated as a time, place and manner restriction subject to intermediate scrutiny); Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 915 F.Supp. 2d 574, 625 (S.D. N.Y. 2013) ("Plaintiffs have alleged that they wish to construct and operate a rabbinical college to foster the expression of certain ideas among and between faculty members and students. As such, the communicative conduct will be more than just congregants' worshipping.").

Given the number of Federal cases addressing religious claims, it should not surprise the Court to learn that there are several which have specifically analyzed conditional zoning of religious facilities as prior restraints on speech. In Adhi Parasakthi Charitable, Medical, Educational, and Cultural Society of North America v. Township of West Pikeland, 721 F.Supp.2d

---

[5] Prior restraint analysis primarily focuses on whether procedures which delay or prohibit speech are constitutional. That question is different from the substantive inquiry into whether a law is content-based or content-neutral. While many content-based laws do impose an unconstitutional prior restraint, the same is true with respect to content-neutral laws. The best example of this in our Circuit is the case of Lady J. Lingerie where the Eleventh Circuit struck a content-neutral zoning law because it afforded too much discretion to the permitting authorities. *See*, discussion *infra* at 13-16.

361, 374 (E.D. Pa., 2010) the Court considered the claims of a Hindu Temple which sought an expansion to accommodate worshipers who speak directly to their deities in the form of stone images. The plaintiff was not allowed to expand without first obtaining conditional use approval from the local zoning board. The board allowed only a modest expansion subject to conditions that amounted to a denial in practice.

The Court analyzed the claim under both the Free Speech and Free Exercise Clauses. The Court noted that this was not simply a claim to build a temple in a particular location because the plaintiffs' religious practices were intimately bound to the structure:

> Plaintiff, however, also alleges that its desired uses of the property as a location for religious worship and as a site for an annual religious festival constitute expressive conduct that should receive First Amendment protection. In determining whether these uses constitute expressive speech we must consider whether they are "imbued with elements of communication." Here, we believe that Plaintiff's desired conduct of worshiping on the premises and holding religious festivals on the property does constitute expressive speech. The act of worshiping is an important part of an individual's life, and one that inherently communicates something to others about that individual's views on society, life, and other more philosophical subjects… Further, the holding of festivals allows for the communication to extend to even more members and increases the likelihood that this conduct will be noticed by, and thereby communicated to, the surrounding community.

Id. at 374; *Compare*, Salvation Army v. Dep't of Cmty. Affs. of State of N.J., 919 F.2d 183, 200 (3d Cir. 1990) (Salvation Army which proselyted to disadvantaged residents at their group home stated a speech claim because its faith practices went beyond mere social services).

The Court then determined that the conditional zoning approval imposed an unconstitutional prior restraint because it afforded too much discretion to the zoning board:

> Plaintiff asserts that the conditional-use provision of Defendant's Zoning Ordinance is overly vague and grants too much discretion to the Zoning Board, thereby constituting a prior restraint on religious speech. As noted above, the conditional use must be granted not only before construction, but also before certain uses are made of the property, some of which include expressive conduct. Section 1612(D)(1) of the Zoning Ordinance sets forth the considerations for the Zoning Board in determining whether to grant a conditional-use application.… Further, the

structuring of the section as well as many of the individual provisions are overly vague. The list includes fifteen factors and no indication of whether these all need to be met individually, or how they are supposed to be weighed. Turning to the individual provisions, it is entirely unclear what constitutes a "harmonious grouping," as required by subsection e, for example, or is "in keeping with the existing character of the neighborhood," as is demanded by subsection h. In addition, whether a use is "in the public interest," under subsection f, seems entirely up to the discretion of the person making the decision…. To the extent, therefore, that Defendant's Zoning Ordinance required approval of a conditional use before property could be used for expressive religious speech, it was not simply a time, place, and manner regulation, but implemented a prior restraint on speech, and will only be permissible if it meets the requirements set forth above.

… We find, therefore, that in granting an overly broad amount of discretion to its Zoning Board in deciding whether to allow expressive religious use of land within the Township, Defendant has created a prior restraint on speech in violation of Plaintiff's First Amendment rights.

Adhi Parasakthi, 721 F.Supp. 2d at 376–77; *Compare*, Congregation Ariel Russian Community Synagogue, Inc. v. Baltimore County, Maryland, 2019 WL 13084437 (D. Md., 2019) (Applying prior restraint analysis to conditional zoning challenged under the Free Exercise Clause); Hollywood Cmty. Synagogue, Inc. v. City of Hollywood., 436 F.Supp. 2d 1325, 1336, 1338 (S.D. Fla. 2006) (Same).

Given this background, it should be clear that Plaintiffs have speech rights which must be protected. It should also be clear that Tallahassee imposes a prior restraint on that speech because there is nowhere in the City where Plaintiffs can operate their Transitional Residential Facility without obtaining permission from the government.

## IV.  **THERE IS A STRONG LIKELIHOOD THAT PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.**

### A.  **Section 10-417 Imposes an Unconstitutional Prior Restraint on Speech.**

Most land uses can operate in an appropriate zoning district without securing any special approval from the City. For example, churches without residential facilities are allowed as of right in Plaintiffs' OR-2 district. However, that is not the case when it comes to Plaintiffs' religious

residential mission. Tallahassee imposes a prior restraint on all Transitional Residential Facilities

because there is no district in the City which such a facility can open without first obtaining a Type

B Site Plan through the City's conditional zoning process:

> **Sec. 10-417. Transition residential facilities.**
> …
> (b)     *Where allowed.* Transitional residential facilities may be allowed in any
> zoning district, with the exception of the industrial district, subject to the limitations
> and in accordance with the procedures and minimum criteria set forth in this
> section.
>
> (c)     *Approval procedure.* New transitional residential facilities and expansions
> to existing transitional residential facilities are subject to type B site plan approval.

Whenever one is required to obtain a permit from the government in order to engage in

speech, the permitting scheme is a prior restraint on activities protected by the First Amendment.

*See*, Shuttlesworth v. City of Birmingham. 394 U.S. 147, 150-51 (1969). When an ordinance acts

as a prior restraint on free speech, the ordinance is presumed to be unconstitutional, and in such

cases, the government bears a heavy burden to demonstrate that the restriction is valid. *See*, Bantam

Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963) ("Any system of prior restraints of expression

comes to this Court bearing a heavy presumption against its constitutional validity."). In this case,

the restraint is unconstitutional because the City's LDCs do not include all of the substantive and

procedural guarantees required by the First Amendment.

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) is the Supreme Court's seminal case

on the subject of prior restraints as they relate to licenses and permits:

> Our cases addressing prior restraints have identified two evils that will not be
> tolerated in such schemes. First, a scheme that places "unbridled discretion in the
> hands of a government official or agency constitutes a prior restraint and may result
> in censorship." Lakewood v. Plain Dealer Publ. Co., 486 U.S. 750, 757, 108 S.Ct.
> 2138, 2143, 100 L.Ed.2d 771 (1988)… [citation omitted] "'It is well settled by a
> long line of recent decisions of this Court that an ordinance which… makes the
> peaceful enjoyment of freedoms which the Constitution guarantees contingent upon
> the uncontrolled will of an official – as by requiring a permit or license which may

be granted or withheld in the discretion of such official – is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'" Shuttlesworth, *supra*, 394 U.S., at 151, 89 S.Ct., at 938-39.

Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible. Freedman, *supra*, 380 U.S. at 59, 85 S.Ct. at 739…Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.

Id, at 225-27. The Eleventh Circuit treats conditional zoning as the equivalent of a licensing requirement. *See*, Lady J. Lingerie, 176 F.3d at 1361 ("But to operate in the CCG–2 zone, an adult entertainment establishment must apply for an exception. This makes an exception the equivalent of a license.").

The Supreme Court has also required any prior restraint to provide for prompt judicial review *before* the status quo is altered. In a licensing context "[o]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression." Freedman v. Maryland, 380 U.S. 51, 58 (1965). Prompt judicial disposition must be guaranteed to guard against government action which threatens to stifle speech. *See*, City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 781 (2004); FW/PBS, 439 U.S. at 228.

Plaintiffs' Complaint includes an extremely detailed analysis of the many reasons why Tallahassee's Ordinance is unconstitutional down to the very word and punctuation mark. Space constraints preclude the same analysis here, but a "greatest hits" summary proves the point:

A.     Unfettered Discretion: The First Amendment requires the zoning determination to be completely ministerial. *See*, Lady J. Lingerie, 176 F.3d at 1362 ("[T]he cases show that virtually any amount of discretion beyond the merely ministerial is suspect. Standards must be precise and

objective.").[6] The §10-417(f) criteria for evaluating Site Plans are anything but ministerial; they are imprecise and allow for unfettered discretion collectively and in every subpart:

(1)     Section 10-417(f)(1):  "consistent with the comprehensive plan";

(2)     Section 10-417(f)(2):  "adequate" security;

(3)     Section 10-417(f)(3): a general prohibition against "unlawful activities";

(4)     Section 10-417(f)(4): "easily accessible" to transit;

(5)     Section 10-417(f)(5): the facility must be of "adequate size";

(6)     Section 10-417(f)(6): "compatible with the general architecture theme, appearance and representative building types of adjacent properties and uses";

(7)     Section 10-417(f)(7): the TRF must not "unreasonably adversely impact upon existing uses or change the character of the area".

Nearly identical criteria were stricken as unconstitutional in Lady J. Lingerie. Id. at 1361-1362 ("None of the nine criteria is precise and objective. All of them - individually and collectively - empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility' or 'environmental" considerations' … This is neither precise nor objective."); Compare, Konikov v. Orange Cty., Fla., 410 F.3d 1317, 1330 (11th Cir. 2005) ("However, when a statute implicates First Amendment rights, we may consider the *risk of*

_____

[6]  The Jacksonville ordinance at issue in Lady J. Lingerie is similar to the Tallahassee LDC in another respect: neither is truly a law of general application as they apply only to a subgroup of uses. Almost all land uses under the Tallahassee LDCs can open and operate as a matter of right in an appropriate zone. A very few uses are subject to conditional zoning of one kind or another. Fewer still are subject to the extensive requirements for Type B Site Plan approval. See, §§9-155(1) –(5), LDC (Listing only five land use categories require Type B Site Plans). Compare, Fulton v. City of Philadelphia, Pennsylvania, _ U.S. _, 141 S. Ct. 1868, 1877 (2021) ("A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" (citations omitted)).

arbitrary enforcement - the possibility that the statute will chill expression." [evaluating special exception requirement for religious gatherings in a residential zone]).[7]

The criteria are also not exclusive; the DRC and the Planning Commission can attach additional unspecified "conditions" to their approval with no substantive limits whatsoever on those conditions. *See*, §§2-138(n), 9-155(10)(j), LDC; Art. IX, §10(g), By-Laws. *Compare*, Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1313 (11th Cir. 2003) ("Ordinance 1204 exceeds the limits of permissible "ministerial discretion." Its provisions permit city officials to decide which statutes or ordinances apply, whether the applicant has violated those laws, and whether they "effectively" prohibit the applicant from obtaining a license."); Am. Entertainers, L.L.C. v. City of Rocky Mount, 888 F.3d 707, 720–22 (4th Cir. 2018) (Same).

B.    Lack of Time Constraints:  The Constitution requires that ordinances imposing a prior restraint include a specific, textual limit on the licensing or permitting process in order to guarantee a decision within a specified brief period of time. The absence of those time constraints means that the ordinance is facially unconstitutional:

> First, the ordinance fails to put any real time limits on the zoning board.  The board must hold a public hearing within 63 days after a business applies for an exception. ... But nothing requires a decision within 63 days, or any other time period. The

---

[7]    Plaintiffs have also alleged that the discretionary criteria are unconstitutionally vague in violation of due process. (Doc. 1 at 19, ¶67). The Court in Hollywood Cmty. Synagogue, 430 F. Supp. 2d at 1327 held that the imprecise criteria in conditional zoning ordinance could be unconstitutionally vague as well as unlawful as a prior restraint:

> The criteria alleged to be applied by the DRB, and the Commission in reviewing the decision of the DRB, are equally vague and imprecise, using terms such as "compatible with the existing natural environment," "adequate provision for safe traffic movement," "adequate setbacks," and "land area is sufficient, appropriate and adequate for the use as proposed."…   As HCS has alleged that Article V provides officials far more than merely ministerial discretion, it has thus stated a claim for relief pursuant to the Supreme Court's vagueness jurisprudence.

ordinance's failure to require a deadline for decision renders it unconstitutional. *See* Redner, 29 F.3d at 1501.

Lady J. Lingerie, 176 F.3d at 1363; *See, also,* Univ. Books & Videos, Inc. v. Miami-Dade Cty., 132 F.Supp. 2d 1008, 1016–17 (S.D. Fla. 2001).

The procedures governing Type B Site Plan review are set forth in §§2-138, 9-155, LDC and Article IX of the Bylaws. None of those procedures guarantee that a decision will be made within a specified brief period of time – or any time. There are multiple opportunities for continuances, rescheduling and referrals to other agencies at literally every stage of the proceedings. These are all reviewed at length in the Complaint [Doc. 1 at 26-33, ¶90) but two examples should suffice to show the problem:

(1)    Under §9-155(10)(j), the DRC is instructed to conduct a hearing, but there is no specific time in which it is required to make an actual decision. That is the exact flaw which doomed Jacksonville's ordinance in Lady J. Lingerie. Id. Worse, the hearing can be continued indefinitely by requesting "additional material and data determined to be necessary to undertake the required review".

(2)    Under Art. IX, §9(1) of the By-Laws, the City is authorized to seek one or more continuances which can be granted upon a mere showing of good cause.

The fact that City's Walk's application took nearly a full year to process tells the entire story in a nutshell. (Doc. at 33, ¶91).

Neither does the Code guarantee the right to speak if the DRC, the ALJ or the Planning Commission fail to make a decision within a specified brief period of time.  The City can deny speech simply by taking no action at all on the application. In addition, there are no consequences specified and no relief afforded to the applicant if the City does not make a timely decision:

The ordinance also permits the City unconstitutionally to deny an adult entertainment license by failing to act on an application. *See* Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (Constitution requires limitation on the time within which licensing decision is made); FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (licensing officials required to make prompt decisions); Artistic Entertainment, Inc. v. City of Warner Robins, 223 F.3d 1306, 1310-1311 (11th Cir. 2000). Although the ordinance requires a decision on a adult entertainment license application within thirty days, it also permits the establishment whose application is not so resolved to open, conditioned on the ultimate licensing decision of the City. Effectively, this gives the City an unlimited length of time to make the application decision.

Fly Fish, 337 F.3d at 1313–14; *See, also*, Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306, 1311 (11th Cir. 2000) ("The adult business ordinance is silent on an applicant's right to begin operating his business if the city fails to act on his application. In light of Redner's holding, which clearly controls here, we can only conclude that the Warner Robins adult business ordinance is facially violative of the First Amendment…".).

C.    Failure to Preserve the Status Quo:  The Ordinance does not preserve the *status quo* for any existing homeless facility, such as City Walk, which must automatically cease operations upon denial of its Site Plan application. The failure to preserve the *status quo* renders the ordinance unconstitutional. *See*, FW/PBS, 493 U.S. at 228 ([T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained…").

D.    Failure to Provide for Prompt Judicial Review:  Section 2-138(o), LDC provides for judicial review through the filing of a petition for certiorari in the circuit court. However, judicial review is effectively impossible if the Planning Commission simply fails to make a decision on the application or continues its deliberations indefinitely:

As there is no assurance within the Land Development Code that the City's final determination will not be delayed indefinitely and there is no clear indication when an applicant has exhausted administrative remedies, the Land Development Code

fails to set forth the appropriate time at which an applicant may request that a court review the City's decision.  Thus, as the Land Development Code could potentially delay judicial review indefinitely, the Land Development Code constitutes a prior restraint on applicants' First Amendment freedoms.

Red-Eyed Jack, Inc. v. City of Daytona Beach, 165 F.Supp.2d 1322, 1329 (M.D. Fla. 2001). The Supreme Court requires not merely prompt access to the court system, but prompt judicial disposition of any restraint on speech. City of Littleton, 541 U.S. at 781 ("A delay in issuing a judicial decision, no less than a delay in obtaining access to a court, can prevent a license from being 'issued within a reasonable period of time.' …Thus we read that opinion's reference to 'prompt judicial review,' as encompassing a prompt judicial decision." (citations omitted)).

### B. Section 10-417 Imposes an Unconstitutional Prior Restraint on the Free Exercise of Religion.

The same prior restraint principles which apply so powerfully in the free speech context find application in Free Exercise cases. The Court in Congregation Ariel Russian Community Synagogue, *supra* considered a zoning scheme which is a close analog to Tallahassee's. Baltimore County allowed religious facilities to operate in particular zoning districts, but also imposed additional zoning restrictions, including an opportunity for a government agency known as the "People's Counsel" to challenge an application. The Court cataloged a number of cases which applied prior restraint law to Free Exercise claims and concluded that Baltimore's conditional zoning was unconstitutional under that framework:

> Prior restraint claims arise most commonly in the free speech context but apply with equal force to the free exercise of religion context.[4] Cantwell v. Connecticut, 310 U.S. 296, 304–06 (1940) (discussing prior restraint in the free exercise context); Messiah Baptist Church v. Cty. of Jefferson, 859 F.2d 820, 834, 834 n.9 (10th Cir. 1988) (McKay, J., dissenting) (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969)) (applying prior restraint framework to a zoning ordinance that required a special permit to build churches); Int'l Soc'y for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 444 (2d Cir. 1981) (discussing prior restraints in the free exercise context). Parties may challenge a permitting scheme as a prior restraint of First Amendment freedoms if it: (1) vests

"unbridled discretion in the hands of a government official or agency"; or (2) "fail[s] to place limits on the time within which the decisionmaker must issue the license." Am. Entertainers, L.L.C. v. City of Rocky Mount, 888 F.3d 707, 720 (4th Cir. 2018) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225–26 (1990)). The Court considers each prior restraint category in turn.

To pass constitutional muster, a licensing regulation must provide "narrow, objective, and definite standards to guide the licensing authority." Id. at 721 (quoting Shuttlesworth, 394 U.S. 147 at 150–51). A zoning ordinance may, therefore, constitute an impermissible prior restraint on First Amendment freedoms if it lacks adequate standards to guide the discretion of public officials. See, e.g., 11126 Balt. Blvd., Inc. v. Prince George's Cty., 58 F.3d 988, 997 (4th Cir. 1995) (en banc), overruled in part by City of Littleton v. Z. J. Gifts D-4, L.L.C., 541 U.S. 774, 778 (2004).

> 4   Zoning ordinances that regulate the construction of places of worship arguably affect both expressive conduct and the free exercise of religion. Cf. Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 629 (1980) (noting that although Cantwell v. Connecticut, 310 U.S. 296 (1940), involved the Free Exercise Clause, the U.S. Supreme Court has subsequently understood the case to also apply to freedom of speech).

Congregation Ariel Russian Cmty. Synagogue, Inc. v. Baltimore Cty., Maryland, 2019 WL 13084437 at *2 (D. Md. 2019).

At least one Federal Court in Florida has also followed that same path. In Hollywood Cmty. Synagogue, 436 F.Supp. 2d 1325 the Court considered a law which required a special exception in order to operate a place of worship in a residential zone. The Court struck down that requirement as a prior restraint on the Free Exercise of religion. In doing so, the Court not only applied the usual prior restraint analysis, but specifically relied on Lady J. Lingerie as controlling authority:

> Instead, the Court finds that Section 5.3.G.1. constitutes an unconstitutional prior restraint because it lacks "narrow, objective, and definite standards" to guide city officials in their review of applications for a Special Exception and thus provides City officials unbridled discretion in their consideration of the application. See, Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1362 (11th Cir. 1999) (noting that "some measure of discretion is acceptable, but ... virtually any amount of discretion beyond the merely ministerial is suspect").
> …

Because Plaintiff HCS, as a place of worship, is entitled to the protections of the Free Exercise clause of the First Amendment, the provision of such unbridled discretion to City officials is constitutionally impermissible.

Hollywood Cmty. Synagogue, 436 F.Supp. 2d at 1336. The same result is mandated here.

### C.    Section 10-417 Unreasonably Burdens the Free Exercise of Religion.

It is axiomatic that laws may not unreasonably burden the Free Exercise of religion.[8] If a law imposes a substantial burden, it will be held unconstitutional unless supported by a compelling governmental interest." See, Jimmy Swaggart Ministries v. Bd. of Equalization of California, 493 U.S. 378, 384–85 (1990) ("Our cases have established that '[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'" (citation omitted)).[9] Plaintiffs have previously shown that the site plan requirement is not a law of general application.[10]

In Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama, 980 F.3d 821 (11th Cir. 2020) the Eleventh Circuit provided a laundry list of factors which a trial court should consider

---

[8] Most contemporary cases appear to consider "substantial burden" claims under the statutory criteria established by Congress through 42 U.S.C. §2000cc (RLUIPA). See, e.g., City Walk - Urb. Mission Inc. v. Wakulla Cty. Fla., 471 F.Supp. 3d 1268 (N.D. Fla. 2020). However, the analysis is fundamentally the same whether the substantial burden claim arises under the statute or is asserted as a constitutional Free Exercise claim. See, e.g., Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1226 (11th Cir. 2004) ("The Supreme Court's definition of "substantial burden" within its free exercise cases is instructive in determining what Congress understood 'substantial burden' to mean in RLUIPA.").

[9] The fact that §10-417 does not specifically mention churches or religion does not insulate it from constitutional scrutiny. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 220 (1972) ("A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion").

[10] See, Motion at 15, n. 6.

when evaluating whether a zoning law imposes an undue burden on religious activities. The following are among those which find particular application to the instant case:

> • the extent to which the City's decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise;
>
> • whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise;
>
> • whether the City's decisionmaking process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around;

Id. at 825–26 (Footnotes omitted).[11]

Other Courts have concluded that the outright denial of zoning approval for a religious activity can constitute a substantial burden under the Free Exercise Clause. In Church of Our Savior v. City of Jacksonville Beach, 69 F.Supp.3d 1299 (M.D. Fla. 2014) the Court found that the denial of a conditional use permit to build a church in a residential zone was unreasonable – particularly where a secular school had obtained approval with conditions not extended to the church:

> The burden now shifts to the City to establish that its actions in denying the Church's CUP were narrowly tailored to further a compelling government interest. Primera, 450 F.3d at 1308; see 42 U.S.C. § 2000cc–2(b). Though raised with respect to the Church's facial challenge, the City maintains that it has a strong interest in preserving the character and safety of its residential neighborhoods through enforcement of its zoning regulations and that the CUP requirement for RS–1 property furthers this interest. (See Doc. 110 at 24–26.) Even assuming that this constitutes a compelling government interest under RLUIPA, the Court finds that a blanket denial of the Church's application was not narrowly tailored to further that interest.

---

[11] It should be noted that, like most religious zoning cases, Thai Meditation is distinguishable from the instant case based on the fact that there no locations where a religious residential mission can open as of right. That is what makes Tallahassee's ordinance an impermissible prior restraint as well as a burden on religious beliefs and practices.

> In considering the Church's application, the Planning Commission had a number of options at its disposal short of straight-out denial. …
>
> On this record, the City has not met its burden of persuading the Court that, when it twice denied the Church's CUP application, but granted Discovery Montessori School's, its actions were narrowly tailored to further the interests it now identifies as compelling.

Id. at 1324. The same conclusion must be drawn here. Tallahassee could have accommodated City Walk's religious mission by imposing reasonable conditions on the Site Plan consistent with the character of the surrounding properties.[12] Instead, Tallahassee unreasonably burdened Plaintiffs' rights without the slightest effort to accommodate their religious practices.

### D.   Section 10-417 Violates Plaintiffs' Right of Free Association.

The constitutional right of Free Association[13] is very much implicated by Plaintiffs' religious residential mission:

> This Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Protected association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends," and "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." Ibid.

Americans for Prosperity Found. v. Bonta, _ U.S. __, 141 S. Ct. 2373, 2382 (2021). Because of this linkage, the legal analysis applicable to free speech claims applies in large measure to Free Association claims. See, e.g., Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1320–21 (11th Cir.

---

[12] This is precisely the resolution recommended by the State-appointed Administrative Law Judge after a two-day evidentiary hearing. The City rejected the ALJ's proposed conditions outright and without comment. (Doc. 1 at 18, ¶¶58-60).

[13] Technically, "the right of the people peaceably to assemble…". CONST., Amend I.

2005) ("As with her free speech claim, the law is clearly established that public employees have a First Amendment right to engage in associative activities without retaliation.").

In <u>Americans for Prosperity</u>, the Supreme Court applied what it called "exacting scrutiny" to a free association claim involving the disclosure of donor lists:

> As explained, exacting scrutiny requires that there be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," <u>Reed</u>, 561 U.S., at 196, 130 S.Ct. 2811 (internal quotation marks omitted), and that the disclosure requirement be narrowly tailored to the interest it promotes, see <u>Shelton</u>, 364 U.S., at 488, 81 S.Ct. 247.

141 S. Ct. at 2385. Any regulation infringing the right of association must justify the burden placed on the right and must be narrowly tailored:

> The point is that a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring.

<u>Id</u>.

Plaintiffs worship with their homeless flock, they minister to them and they provide them food and shelter available nowhere else in the City. There can be no doubt that Plaintiffs' religious interaction with their constituents is more socially meaningful than merely breaking bread together. However, even the mere act of eating can potentially be a significant undertaking for purposes of Free Association:

> In understanding what is going on around us, context matters. Food shared with company differs greatly from a meal eaten alone. Unlike a solitary supper, a feast requires the host to entertain and the guests to interact. Lady Macbeth knew this, and chided her husband for "not giv[ing] the cheer" at the banquet depicted in Shakespeare's play. As she explained: "To feed were best at home; From thence, the sauce to meat is ceremony. Meeting bare without it." William Shakespeare, The Tragedy of Macbeth, Act III, scene 4 (1606).

<u>Fort Lauderdale Food Not Bombs</u>, 901 F.3d at 1237.

Tallahassee's Land Development Code makes it effectively impossible for Plaintiffs, and other similarly situated religious entities, from gathering with their flock. The zoning restrictions apply not only to City Walk's current location, but *to every other site* where it might seek to relocate. Plaintiffs' religious assemblies can occur only with a majority vote by the DRC and Planning Commission to approve a site plan:

> As with the free speech claim, the City does not put forth any argument as to why the Church has failed to state a claim for violation of the right to peaceable assembly. The Church maintains that requiring a special exception for houses of worship located on less than one acre, both on its face and as applied, unjustifiably prohibits the Church from peacefully assembling to worship on its property.
>
> When considering a right to peaceable assembly claim, "the state must have a compelling interest in the subject matter to justify abridgment, and the scope of the abridgment itself must not be greater than reasonably necessary to serve the state interest." Blasecki v. City of Durham, N. C., 456 F.2d 87, 91 (4th Cir. 1972).

Redemption Cmty. Church v. City of Laurel, Maryland, 333 F. Supp. 3d 521, 538 (D. Md. 2018); *See, also*, Crowder v. Hous. Auth. of City of Atlanta, 990 F.2d 586, 592 (11th Cir. 1993) ("One's right to ... free speech ... to freedom of worship and assembly ... may not be submitted to vote." (citation omitted)).

While the City may have an interest in restricting the location of residential ministries, the means selected in this instance unnecessarily burden the right of assembly and are not narrowly tailored. There are less restrictive means of regulating assemblies such as Plaintiffs', including designating only particular zones as appropriate for residential ministries, setting fixed buffer zones from neighborhoods and limiting occupancy according to an established formula.

The City may claim that Plaintiffs' speech and associational rights are not infringed because they can still meet with the same people in the City Walk church, which is a permitted use in the OR-2 zone. However, the rights of speech and association are broader than that. Put in real terms, there is a difference between preaching about charity and living out Christ's dictates by

actually engaging in charity. As the Supreme Court has said "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 163 (1939).

## V.   PLAINTIFFS ARE THREATENED WITH IRREPARABLE INJURY.

No lengthy argument on this point is necessary. The deprivation of rights guaranteed under the First Amendment is an irreparable injury as a matter of law. See, Elrod v. Burns, 427 U.S. 347 (1976). Since the Plaintiffs allege that they are threatened with the loss of First Amendment rights, irreparable injury is presumed. "It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." Deerfield Medical Center v. County of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981); See, also, FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury.").

While no single one of the injunction factors is controlling, "a strong showing of one element may compensate for a weaker showing of another." Democratic Senatorial Campaign Comm. v. Detzner, 347 F. Supp. 3d 1033, 1037 (N.D. Fla. 2018). The likelihood that the Plaintiffs will prevail on the merits is overwhelming; the "balancing of harms" test clearly favors the Plaintiffs.

An injunction which prevents the enforcement of a patently unconstitutional Ordinance does not disserve the public interest. To the contrary, "enjoining the ordinances, if they were found to be in violation of the First Amendment, would advance the public's interest in freedom of speech." FF Cosmetics, 866 F.3d at 1298; See, also, Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

This requested injunction is in the highest traditions of our system of government, and will not disserve any legitimate governmental interest. The bond requirement, if any, should be *de minimis*.

WHEREFORE, Plaintiffs pray for entry of a Preliminary Injunction enjoining the City of Tallahassee and its officers and agents from enforcing §§2-138, 9-155, and 10-417 of the Tallahassee Land Development Code, and Article IX of the Bylaws of The Tallahassee-Leon County Planning Commission, and from requiring Plaintiffs to obtain Type B Site Plan approval, during the pendency of this proceeding.

## CERTIFICATE OF COMPLIANCE

I certify that this Motion and Supporting Memorandum complies with the type-volume limitation set forth in 7.1(F), N.D.Fla.Loc.R.. This Motion contains 7,937 words.

*Respectfully Submitted,*

DUDLEY, SELLERS, HEALY &
HEATH, PLLC

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.

_/s/  Gary S. Edinger_

SHAWN M. HEATH, Esquire
Florida Bar No.: 255970
SunTrust Financial Center, Ste 301
3522 Thomasville Road
Tallahassee, Florida 32309
(850) 528-0039
Shawn@DSHattorneys.com

GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger12@gmail.com

Attorneys for Plaintiffs